*Andrew Campbell Founds v. State of Maryland*, No. 48, September Term, 2025. Opinion by Eaves, J.

**CRIMINAL LAW – MOTION TO SUPPRESS – SEARCHES AND SEIZURES – INDEPENDENT SOURCE DOCTRINE**

The Supreme Court of Maryland held that the Appellate Court of Maryland properly applied the independent source doctrine to affirm the denial of the Petitioner's motion to suppress. Under the independent source doctrine, where a warrant includes observations derived from an unlawful search alongside independently obtained information, courts apply the objective excision methodology, asking whether the affidavit, with the tainted material removed, establishes probable cause. Assuming—without deciding—that a Fourth Amendment violation occurred in this case, the Court held that the remaining information after excision established probable cause to support the subsequent search of the Petitioner's apartment.

**CRIMINAL LAW – SUFFICIENCY OF THE EVIDENCE**

The Supreme Court of Maryland held that the State introduced sufficient evidence to support the Petitioner's convictions for possession of over fifty pounds of marijuana, psilocyn mushrooms, and bulletproof body armor. To determine whether a defendant constructively possessed contraband, the Court applied the four-factor framework established in *Smith v. State*, 415 Md. 174 (2010), examining: (1) the defendant's proximity to the contraband, (2) whether the contraband was in plain view of and/or accessible to the defendant, (3) whether there were indicia of mutual use and enjoyment, and (4) whether the defendant had an ownership or possessory interest in the location where the contraband was discovered. The evidence permitted a rational factfinder to conclude that the Petitioner's apartment served as a stash house for a drug-dealing enterprise whereby he could be said to benefit from the mutual use and enjoyment of the contraband; the Petitioner had a possessory interest in the entire apartment—including Bedroom 2 where the marijuana and mushrooms were found—granting him access to that contraband; and he had been inside the apartment proximate to the contraband moments before his arrest. While the Court declined to adopt the State's broader theory that evidence of a drug-dealing enterprise is alone sufficient to establish constructive possession of all contraband within the apartment, the totality of the evidence assessed through the four factors supported each of the three possessory convictions.

Circuit Court for Worcester County
Case No. C-23-CR-23-000016
Argued: March 10, 2026

IN THE SUPREME COURT

OF MARYLAND

No.48

September Term, 2025

---

ANDREW CAMPBELL FOUNDS

v.

STATE OF MARYLAND

---

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

---

Opinion by Eaves, J.
Watts, Biran, and Gould, JJ., dissent.

---

Filed: August 7, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# I
# INTRODUCTION

After investigation and surveillance, law enforcement suspected that Andrew Campbell Founds possessed a large quantity of marijuana that was the subject of a controlled FedEx delivery. Following a brief interaction with law enforcement, officers detained Mr. Founds and engaged in a protective sweep of his apartment after Mr. Founds relayed to the officers that there was another individual in his apartment. During that protective sweep, officers observed in plain view various drugs, firearms, and a bulletproof vest. Law enforcement subsequently presented everything that transpired, including their observations inside Mr. Founds' apartment, in an application for a warrant to search the apartment. A judge issued that warrant; police eventually searched and seized the contraband and accordingly charged Mr. Founds.

Mr. Founds moved in the Circuit Court for Worcester County to exclude the evidence on the basis that officers had unconstitutionally searched his home during the protective sweep prior to the issuance of the warrant and that the police officers' observation of the contraband therein—which was mentioned in the affidavit in support of the subsequently issued warrant—tainted the warrant. The circuit court denied that motion and a subsequent motion to reconsider, and Mr. Founds pleaded not guilty to an agreed-upon statement of facts to three possessory offenses. The circuit court found Mr. Founds guilty on all three counts. Mr. Founds appealed to the Appellate Court of Maryland, challenging both the denial of his motion to suppress, as well as the sufficiency of the evidence for his three convictions. The Appellate Court affirmed the

circuit court on both issues. We issued a writ of certiorari in this case to review those same issues.[1]

For the reasons discussed below, we hold that the circuit court properly denied Mr. Founds' motion to suppress and that there was sufficient evidence to support his various convictions. We, thus, affirm the judgment of the Appellate Court.

## II
## BACKGROUND

### A.    *Factual Background*

In December 2022, an employee at the Baltimore-Washington International Airport FedEx distribution hub became suspicious of a medium-sized cardboard package and alerted FedEx security. The employee forwarded the package to a shipping hub in Salisbury, Maryland, where a FedEx security employee, suspecting that the package contained "illegal contraband," opened the package. FedEx employees observed what they believed to be marijuana and contacted the Wicomico County Sheriff's Office. Sergeant Tyler Bennett responded, seized the package, returned to his office for further investigation, and determined that it contained approximately 17 heat-sealed packages with a total net weight of 19.6 pounds of marijuana tetrahydrocannabinol. Because the FedEx package contained a delivery address located in Worcester County, Sgt. Bennett contacted members of the Worcester County Sheriff's Office Criminal Enforcement Team to conduct further investigation.

The heat-sealed packages were placed in their original packaging and resealed so

---

[1] *Founds v State*, 492 Md. 646 (2025).

that detectives could conduct a controlled delivery of the package to the address indicated on the shipping label. A detective placed the package on the front porch of the residence, knocked on the door, and left. Approximately two hours later, a different detective observed a white male arrive at the address in a grey Kia, place the package in his vehicle, and leave. A registration check revealed that the Kia was registered to Mr. Founds.

While surveilling the vehicle, detectives lost sight of it; however, they eventually learned of an address associated with Mr. Founds and proceeded to that address. Upon arriving at that address, detectives noticed the same grey Kia that they previously had been surveilling. Detectives approached the house and spoke with the homeowner who indicated that the vehicle belonged to Mr. Founds, who rented an apartment in the residence with a separate entrance. Detective Corporal Converse, of the Worcester County Sheriff's Office, proceeded to the separate entrance, knocked, and announced himself. Mr. Founds eventually answered the door, at which point Det. Cpl. Converse observed an overwhelming smell of marijuana emanating from inside the apartment. Det. Cpl. Converse noted that Mr. Founds seemed "overly nervous" and was "trembling and covered in sweat." Det. Cpl. Converse advised Mr. Founds that officers were conducting a drug investigation and believed him to be in possession of a package of marijuana. Mr. Founds then became uncooperative, and Det. Cpl. Converse placed him in an investigative detention. Law enforcement proceeded to conduct a protective sweep of the apartment "in preparation for a search warrant." During the sweep, detectives located another individual on the stairwell and detained him. Detectives also observed in plain

3

view several heat-sealed bags containing what they suspected was marijuana and a large brown box consistent with the original FedEx package.

Upon securing the apartment, detectives applied for a search warrant. The supporting affidavit detailed the above investigative steps taken from the time the FedEx package was first noted at the airport through the point that the officers conducted the protective sweep of Mr. Founds' apartment. A judge in the District Court of Maryland sitting in Worcester County issued the warrant, which law enforcement officers executed that evening.

Mr. Founds' apartment contained two bedrooms, a common living room and common area, a kitchen, a bathroom, and a storage room. Pursuant to the search, officers discovered a total net weight of 52.364 pounds of marijuana distributed throughout the apartment. In Bedroom 1, detectives found the original FedEx package containing fourteen heat-sealed packages of marijuana with a net weight of 13.2666 pounds, as well as several firearms and ammunition. In Bedroom 2, officers found four bags containing psilocyn mushrooms weighing roughly 2.5 pounds and numerous bags of marijuana. In addition to what they recovered from both bedrooms, officers recovered more marijuana, a firearm, several high-capacity magazines and ammunition, eight digital scales, roughly $80,000 in cash, drug ledgers, and a bulletproof vest. The marijuana recovered outside Bedroom 1—including that found in Bedroom 2 and elsewhere in the apartment—totaled 39.098 pounds, which, combined with the 13.266 pounds from Bedroom 1, comprised the total 52.364 pounds of marijuana.

*Procedural History*

## 1. The Circuit Court for Worcester County

In January 2023, the State charged Mr. Founds in the Circuit Court for Worcester County with ten counts arising from the seizure of contraband from his apartment. Mr. Founds filed a motion to suppress, alleging that the evidence obtained was discovered through an illegal search because "the warrant on which the search was based was devoid of sufficient probable cause[.]" Specifically, Mr. Founds argued that, under *Buie v. State*, 320 Md. 696 (1990), a protective sweep is authorized only incident to a lawful arrest. Because he was subject to an investigative detention, Mr. Founds argued that "[a] protective sweep was prohibited because [he] was not the subject of a valid arrest prior to officers entering his home." He alternatively argued that, under *Buie*, law enforcement had no reasonable articulable suspicion to believe that there was another armed occupant inside the residence. Thus, because the "source of the probable cause for the [w]arrant was obtained in violation of the [Fourth] and [Fourteenth] Amendment[s,]" and because "no other basis existed for the warrant," Mr. Founds argued that "all evidence obtained as a result of the execution of the warrant must be suppressed[.]"

The State submitted a generic answer denying "each, every, and all of the allegations" in Mr. Founds' motion to suppress. Mr. Founds' original motion was filed in February 2023 and contained bald allegations that the warrant was secured without probable cause. The State submitted its answer summarily denying Mr. Founds' allegations on March 15, 2023. It was not until one week after the State submitted its answer that Mr. Founds submitted a supplement to his original motion, including a

memorandum of law, which more fully fleshed out his arguments regarding the warrant, as we recounted above.

The circuit court held a hearing in April 2023. The court found that, while an exigency existed for the purposes of conducting the protective sweep, the officers unlawfully created the exigency. The court then excised the portions of the search warrant affidavit containing the detectives' observations from inside the apartment and found that the remaining information provided a sufficient basis for the issuing judge to find probable cause. The court accordingly denied the motion to suppress.

Mr. Founds filed a motion for reconsideration. Relying on this Court's opinion in *Miles v. State*, 365 Md. 488 (2001), Mr. Founds argued that the circuit court had used the wrong standard in deciding his motion to suppress. In Mr. Founds' view, the correct test is not whether, in excising the tainted information from the warrant, the issuing judge still could have found that probable cause existed; rather, the correct test is whether "the seizure of the evidence is sufficiently attenuated from the taint of the clearly unlawful initial intrusion[.]" For its part, the State argued that the facts of *Miles* made it inapplicable to the case at bar and that the doctrines of independent source and inevitable discovery "support a finding of probable cause[]" based on the other information "within the four corners of the search warrant."

In a written order, the court denied the motion for reconsideration and refined its earlier ruling. After reviewing *Miles* and *Kentucky v. King*, 563 U.S. 452 (2011), the court found that the officers created the exigency but "did not do so by violating, or threatening to violate the Fourth Amendment[.]"

6

Mr. Founds pleaded not guilty to an agreed-upon statement of facts to Count II (possession of fifty pounds or more of cannabis in violation of Md. Code Ann., Crim. Law ("CR") § 5-612), Count IV (possession of psilocyn with intent to distribute in violation of CR § 5-602), and Count X (possession of a bulletproof body armor during and in relation to a drug trafficking crime in violation of CR § 4-106). After the State read the agreed-upon statement of facts, Mr. Founds moved for judgment of acquittal, which the court implicitly denied by subsequently finding Mr. Founds guilty on Counts II, IV, and X. The circuit court sentenced Mr. Founds to a total of ten years of imprisonment, with all but five years suspended without parole, and three years of supervised probation. Mr. Founds noted a timely appeal to the Appellate Court of Maryland.

## 2. The Appellate Court of Maryland

In the Appellate Court, Mr. Founds presented two issues: (1) whether the circuit court erred in denying his motion to suppress and (2) whether there was sufficient evidence to find that he exercised dominion and control over the contents recovered in Bedroom 2. *Founds v. State*, No. 2266, 2025 WL 2374199, at *1 (Md. App. Ct. Aug. 15, 2025). The Appellate Court affirmed the circuit court on both issues. *Id.*

As to the motion to suppress, the court held that the detectives were justified in conducting the protective sweep due to exigent circumstances (possible destruction of evidence), the detectives did not create the exigency through a Fourth Amendment violation, and the warrant application was not tainted. *Id.* at *6. Although the court concluded that the warrant did not contain any information obtained in violation of the

7

Fourth Amendment, the court observed that, even if the protective sweep were unlawful, the excised search warrant provided a substantial basis for the issuing judge to find probable cause under the independent source doctrine. *Id.* at *6–8.

On the sufficiency question, the court held that there was sufficient evidence for the circuit court to find that Mr. Founds possessed the contraband found in Bedroom 2 and the body armor. *Id.* at *10. The court reasoned that a rational factfinder could conclude that the apartment served as a stash-house for a drug-dealing enterprise in which Mr. Founds participated and that he exercised dominion and control over the contraband in Bedroom 2, as well as the body armor. *Id.*

## III
## STANDARD OF REVIEW

With respect to this Court's review of a circuit court's ruling on a motion to suppress, our scope is limited to the facts generated by the record at the suppression hearing. *State v. Stone*, 493 Md. 78, 96 (2026). We accept the circuit court's findings of fact unless clearly erroneous and review the record and any reasonable inferences drawn therefrom in the light most favorable to the prevailing party on the motion. *Id.* Questions of law are reviewed de novo, and where a party has raised a constitutional challenge to a search or seizure, we must make an "independent constitutional evaluation as to whether the officer's encounter with the defendant was lawful." *Id.* (quoting *Sizer v. State*, 456 Md. 350, 362 (2017)).

As to the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the State, any "rational trier of fact could have found the

8

essential elements of the crime." *Nguyen v. State*, 492 Md. 179, 197 (2025) (quoting *State v. Pagotto*, 361 Md. 528, 533 (2000)). We do not re-weigh the evidence or ask whether we believe "the evidence at trial established guilt beyond a reasonable doubt." *Id.* at 198 (quoting *Pagotto*, 361 Md. at 534). Rather, we review whether the verdict was supported by evidence that could convince a rational trier of fact of the essential elements of the crime beyond a reasonable doubt. *Id.*

# IV
# ANALYSIS

Mr. Founds challenges his conviction on two grounds: that (1) the detectives manufactured the exigency that justified their warrantless entry into his apartment, requiring that the evidence subsequently recovered pursuant to the search warrant be suppressed as fruits of an illegal search that violated the Fourth Amendment[2] and (2) the State lacked sufficient evidence to prove that Mr. Founds constructively possessed the marijuana and psilocyn mushrooms located in Bedroom 2 and the body armor.

We begin our analysis by providing an overview of certain Fourth Amendment

---

[2] Although Mr. Founds argued in his supplemental motion to suppress that law enforcement's actions were violative of the Maryland Declaration of Rights, the circuit court did not separately address any claim under Maryland law and ruled exclusively on the Fourth Amendment ground. Mr. Founds did not ask the circuit court to consider any separate State ground in his motion for reconsideration, nor did he raise such an issue in his brief to the Appellate Court of Maryland, which likewise did not address that issue. Our analysis, thus, proceeds solely under the Fourth Amendment, and we need not address whether the Maryland Declaration of Rights affords greater or lesser protection than the Fourth Amendment in this context. *See Washington v. State*, 482 Md. 395, 454–55 (2022) ("[While] we have asserted that Article 26 may have a meaning independent of the Fourth Amendment, we have not held, to date, that it provides greater protection against state searches than its federal kin." (quoting *King v. State*, 434 Md. 472, 483 (2013))).

principles, namely, the exclusionary rule and the exception to that rule that plays the predominant role in this case—the independent source doctrine. We discuss the Supreme Court of the United States' opinion in *Murray v. United States*, 487 U.S. 533 (1988), in which the Court held that the independent source doctrine applies to evidence initially discovered unlawfully but subsequently lawfully obtained as a result of an independent source untainted by the initial illegality. We then turn to a question of first impression in Maryland concerning the independent source exception to the exclusionary rule and, specifically, the standard that governs when a suppression court is asked to exclude evidence obtained pursuant to a search warrant when the search warrant affidavit includes information that was observed during a prior unlawful entry. After adopting the objective approach to *Murray*'s second prong, in the same manner as every federal circuit court that has addressed the issue, we move on to the facts of Mr. Founds' case.

We assume—without deciding—that the detectives' entry into Mr. Founds' apartment constituted a Fourth Amendment violation. Even so, we hold that, under the independent source doctrine, the assumed illegal entry in this case does not compel suppression of the evidence seized pursuant to the subsequent warrant-authorized search. After excising any tainted material from the warrant affidavit, the remaining untainted information independently establishes probable cause. With the contraband in Mr. Founds' apartment lawfully in play, we also hold that the agreed-upon statement of facts provided a sufficient basis for the circuit court to find beyond a reasonable doubt that Mr. Founds committed the three possessory offenses for which he was convicted. We, therefore, affirm the denial of Mr. Founds' motion to suppress and uphold his

10

convictions.

**A.** ***The Fourth Amendment, the Exclusionary Rule, and the Independent Source Doctrine***

The Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, protects individuals against unreasonable searches and seizures. *Stone*, 493 Md. at 98–99. Generally, evidence obtained in violation of these protections is subject to the exclusionary rule, which prevents governments from using—in any fashion—such evidence, as well as "fruit[s] of the poisonous tree," i.e., any evidence derivative of the illegal conduct. *Thornton v. State*, 465 Md. 122, 150 (2019); *see also Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used *before the Court* but that it shall not be used *at all*." (emphases added)). The exclusionary rule is not grounded in the text of the Fourth Amendment; rather, it is a judicially created remedy. *See Stone v. Powell*, 428 U.S. 465, 482 (1976) ("The exclusionary rule was a judicially created means of effectuating the rights secured by the Fourth Amendment."). Because the exclusionary rule's purpose is to deter government actors from violating the Fourth Amendment, *Thornton*, 465 Md. at 150, it applies only "where its deterrence benefits outweigh its substantial social costs[,]" *id.* (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)).

And because the exclusionary rule is not absolute, there are well-recognized exceptions that permit evidence to be used notwithstanding a Fourth Amendment violation, and these exceptions include the doctrines of (1) attenuation, (2) inevitable

11

discovery, and (3) independent source. *Williams v. State*, 372 Md. 386, 409 (2002). These exceptions reconcile the exclusionary rule's deterrence function with the interest of presenting the factfinder with all probative evidence where the connection between the illegal conduct and the evidence has been sufficiently severed. *Id.* at 410; *see Nix v. Williams*, 467 U.S. 431, 444 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[] . . . []then the deterrence rationale has so little basis that the evidence should be received.").

Although the attenuation and inevitable discovery exceptions are not before us, it is worth briefly mentioning them. The attenuation doctrine allows evidence to be used notwithstanding a Fourth Amendment violation where the "connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance[.]" *Strieff*, 579 U.S. at 238. In applying the attenuation doctrine, courts consider the "'temporal proximity' between the unlawful conduct and the discovery of the evidence," the "presence of intervening circumstances," and the "purpose and flagrancy of the official misconduct." *Thornton*, 465 Md. at 151 (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

The inevitable discovery doctrine applies when evidence *would* have been discovered through lawful means even though it initially was discovered through a Fourth Amendment violation. *Williams*, 372 Md. at 410. The Supreme Court has held that, so long as a government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[,]"

then the exclusionary rule will not bar use of the evidence because, in that scenario, "the deterrence rationale [would have] so little basis[.]" *Nix*, 467 U.S. at 444. The operative inquiry is what would have happened if the lawful investigation had proceeded, not merely what could have happened. *See Williams*, 372 Md. at 416 ("[S]peculation will not satisfy the demands of the inevitable discovery doctrine[] . . . ."); *Elliot v. State*, 417 Md. 413, 437 (2010) (discussing courts' reluctance to apply the doctrine to ephemeral evidence or scenarios where a government expects a person to wait for an officer to arrive with a valid warrant).

The independent source doctrine applies when evidence was *actually* discovered through lawful means wholly independent of any constitutional violation. *Williams*, 372 Md. at 410–11. When evidence is found pursuant to a search warrant obtained following an unlawful entry, the independent source doctrine can be an exception to suppression if the warrant rests on an untainted, independent foundation—that is, if the warrant was not issued based on information acquired during the illegal entry. *Murray*, 487 U.S. at 542. Unlike the inevitable discovery doctrine, which asks whether law enforcement *would have discovered* the evidence through other lawful means, the independent source doctrine addresses whether the evidence was *actually obtained* through lawful means independent of the unlawful conduct. *Id.* Here, the State relies upon the independent source doctrine, and our analysis now turns to that doctrine in greater detail.

The Supreme Court of the United States first recognized the independent source doctrine in *Silverthorne*. There, the Court stated the doctrine's animating principle: Lawfully obtained information remains usable even when a government has previously

come by the same facts through unlawful means. *Silverthorne*, 251 U.S. at 392. There, two business owners were arrested pursuant to an indictment, and the Federal Government unlawfully seized books, papers, and documents from the business. *Id.* at 390. With the knowledge it possessed about the aforementioned documents, the Government filed a new indictment. *Id.* at 391. The district court, however, ordered that the original business records be returned but impounded the copies and photographs. *Id.* The Government then filed new subpoenas to reobtain the originals. *Id.* The business owners refused, and the Government subsequently initiated a contempt proceeding, which ended in a finding of contempt against the business and imprisonment for one of the business owners. *Id.* at 390–91. During that proceeding, the Government, acknowledging that it originally unlawfully seized the business records, nevertheless contended that it could use the information it learned from those records to "call upon the owners in a more regular form to produce them[]" and that the Fourth Amendment protects mere physical possession. *Id.* at 391. The Supreme Court squarely rejected that argument:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

*Id.* at 392. Because that did not occur in *Silverthorne*, the Government could not leverage the information it learned from the unlawful seizure to turn around and subpoena the business owners for those very same documents. *Id.*

14

In *Franks v. Delaware*, the Supreme Court held, for the first time, that a criminal defendant has a right—after the *ex parte* issuance of a search warrant—to challenge the veracity of statements in an affidavit submitted in support of the warrant. 438 U.S. 154, 155–56 (1978). There, the defendant sought to challenge the truthfulness of some of the statements contained in a warrant that eventually led to the seizure of incriminating evidence. *Id.* at 157–58. The trial court denied the motion to suppress, and the Supreme Court of Delaware affirmed, holding that a defendant could *never* attack the veracity of statements contained in a warrant affidavit. *Id.* at 160. The Supreme Court reversed. It held that, when the Fourth Amendment demands a showing of probable cause, "the obvious assumption is that there will be a *truthful* showing." *Id.* at 164–65 (quoting *United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966)). In other words, the information proffered by the affiant must be "believed or appropriately accepted by the affiant as true." *Id.* at 165. The Court, thus, held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–56. Because the Delaware courts embraced an absolutist view that a defendant could never challenge the veracity of the statements contained in a warrant affidavit, the Supreme Court reversed and remanded the case back to the Delaware courts to determine,

in the first instance, whether the defendant was entitled to such a hearing. *Id.* at 172. Although *Franks* concerned deliberately false statements rather than information obtained in violation of the Fourth Amendment, the Supreme Court established the excision methodology for testing whether a warrant could validly stand alone on its otherwise legitimate portions. *Id.* at 171–72.

Several years later, the Supreme Court decided *Segura v. United States*, 468 U.S. 796 (1984), reaffirming and clarifying the independent source doctrine framework. There, officers unlawfully entered an apartment to secure it while a separate officer obtained a search warrant, but the officers inside observed, in plain view during a protective sweep, items associated with drug trafficking. *Segura*, 468 U.S. at 799–801. Nothing discovered during the initial illegal entry was presented to the judge who ultimately issued the warrant, and none of the evidence discovered during that initial, illegal search was at issue. *Id.* at 801, 813–14.[3] The Court held that all the evidence discovered during the subsequent warrant-authorized search was admissible because it

---

[3] In *Segura*, the district court ruled that there were no exigent circumstances justifying the initial illegal entry. 468 U.S. at 802. Even though the district court agreed that the warrant otherwise furnished probable cause, it ruled that the drugs seized pursuant to the search warrant were nevertheless fruit of the poisonous tree, requiring that *all* the evidence be suppressed. *Id.* On appeal, the United States Court of Appeals for the Second Circuit affirmed the district court's conclusion that no exigent circumstances existed to justify the initial illegal entry, thereby requiring suppression of the evidence *observed in plain view* during that illegal entry. *Id.* at 802–03. But the Second Circuit reversed the district court's conclusion that the evidence seized *pursuant to the search warrant and not originally observed during the illegal entry* also had to be suppressed. *Id.* at 803. Thus, the only issue before the Supreme Court was "whether drugs and the other items not observed during the initial [illegal] entry and first discovered by the agents the day after the entry, under an admittedly valid search warrant, should have been suppressed." *Id.* at 804.

was obtained through an independent source wholly unconnected to the illegal entry. *Id.* at 813–14. The Court emphasized that "[n]one of the information on which the warrant was secured was derived from or related in any way to the initial entry into [the defendants'] apartment[,]" and that "[n]o information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant." *Id.* at 814.

In *Murray*, the Supreme Court picked up where *Segura* left off, addressing how the independent source doctrine applies where "evidence acquired by an untainted search . . . *is identical to the evidence unlawfully acquired*." 487 U.S. at 538. There, federal agents unlawfully entered a warehouse and observed, in plain view, burlap-wrapped bales later confirmed to contain marijuana. *Id.* at 535. As in *Segura*, the officers did not disclose the warrantless entry, or any observations made during that entry, to the magistrate. *Id.* at 535–36. The Court held that evidence initially observed during an unlawful search may be admitted if it was subsequently seized through a lawful independent source, reaffirming that the exclusionary rule's deterrence purpose—to put police "in the same, not . . . *worse*, position that they would have been in if no police error or misconduct had occurred"—is fully served without suppression in that circumstance. *Id.* at 537 (quoting *Nix*, 467 U.S. at 443). The Court explained the contours of the independent source doctrine:

> The ultimate question, therefore, is whether the search pursuant to [the] warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. *This would not have been the case if* the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was

presented to the Magistrate and affected [their] decision to issue the warrant.

*Id.* at 542 (emphasis added) (footnote omitted). On those points, the Supreme Court noted that the United States Court of Appeals for the First Circuit in that case made the following statements:

> [W]e can be absolutely certain that the warrantless entry *in no way contributed in the slightest either to the issuance of a warrant or to the discovery of the evidence* during the lawful search that occurred pursuant to the warrant.
>
> \*    \*    \*
>
> This is as clear a case as can be imagined where *the discovery of the contraband in plain view was totally irrelevant to the later securing of a warrant and the successful search that ensued*. As there was no causal link whatever between the illegal entry and the discovery of the challenged evidence, we find no error in the court's refusal to suppress.

*Id.* at 542–53 (alterations in original) (emphases added) (quoting *United States v. Moscatiello*, 771 F.2d 589, 603, 604 (1st Cir. 1985)). While the Supreme Court was satisfied that law enforcement's decision not to reveal to the magistrate the prior illegal entry and subsequent observations ensured that the issuing magistrate's decision was not infected, it was not so persuaded regarding possible officer motivation. *Id.* at 543. The Supreme Court was concerned with an appellate court making such assertions without a sufficient factual basis in the record and remanded the matter to the district court to correct that error. *Id.* ("[I]t is the function of the District Court rather than the Court of Appeals to determine the facts, and we do not think the Court of Appeals' conclusions are supported by adequate findings.").

Thus, under *Murray*, a warrant obtained after an illegal search is not an

18

independent source if either of the following are true: (1) "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry," or (2) "information obtained during that entry was presented to the Magistrate and affected his [or her] decision to issue the warrant." 487 U.S. at 542. In other words, *Murray* established a two-pronged test, and both questions must be answered in the affirmative for the warrant to be an independent source.

As discussed above, *Murray* did not involve a circumstance in which the warrant application or affidavit contained information that was obtained from the unlawful entry. This case requires us to examine the independent source exception to the exclusionary rule in the context of a search warrant containing some untainted and some tainted information.

The proper approach to assessing situations concerning officer motivation or effect on the issuing judge has produced stark disagreement among federal and state courts. For example, federal and state courts alike are divided on whether the first prong is objective, asking whether a reasonable officer would have sought a warrant regardless of the unlawful observations, or subjective, requiring proof that the particular officers in a case actually would have done so absent the illegal entry.[4] On the second prong, as we discuss

---

[4] *Contrast United States v. Flores*, 888 F.3d 537, 546 (1st Cir. 2018) ("The question of an officer's subjective intent to pursue a warrant depends on the totality of the circumstances. Although 'after-the-fact assurances' by an officer regarding his intent may be probative, an inquiring court is not bound by such assurances if the officer lacks credibility or if objective factors render his assurances 'implausible.'" (citations omitted)), *United States v. Barefoot*, 391 F. App'x 997, 999 (3d Cir. 2010) ("The court may presume law enforcement officers will act reasonably, absent evidence to the contrary." (citation omitted)), *United States v. Williams*, 656 F. App'x 751, 754 (6th Cir.

in more detail below, every federal circuit court that has addressed the issue has determined that it is an objective analysis and has applied the redaction or excision methodology that the Supreme Court held was appropriate in *Franks*. A handful of state appellate courts have held, however, that the State must prove the second *Murray* prong with historical facts in the record, and no warrant can be truly independent of the Fourth Amendment violation if the warrant application contains information derived from the

2016) (framing the inquiry as one of "plausible interpretation" rather than the officers' subjective intent and concluding that the more plausible interpretation was that the officers would not have sought the warrant absent the unlawful discovery), *State v. Gaines*, 116 P.3d 993, 998 (Wash. 2005) (en banc) (holding that officers would have sought a warrant irrespective of the illegally obtained evidence "through the course of predictable police procedures[,]" despite there being no findings as to what the particular officers actually would have done), *Commonwealth v. Katona*, 240 A.3d 463, 481 (Pa. 2020) (answering the question by reference to the four corners of the warrant affidavit rather than findings about the particular officers' subjective intent, and thereby treating the inquiry as objective), *and State v. Van Linn*, 971 N.W.2d 478, 484–85 (Wis. 2022) (finding officers were not prompted to subpoena defendant's medical records because of the unlawful observations despite the trial court not making such findings), *with United States v. Aigbekaen*, 943 F.3d 713, 725 (4th Cir. 2019) (emphasizing it is for the trial courts to make findings of fact related to officer's motivation), *United States v. Restrepo*, 966 F.2d 964, 972 (5th Cir. 1992) ("Here, the district court did not consider whether the results of the illegal search . . . prompted or motivated the officers' decision to seek the warrant. As motivation is a question of fact, we remand this issue to the district court."), *United States v. Huskisson*, 926 F.3d 369, 376–77 (7th Cir. 2019) (holding that the trial court applied the correct standards in making factual findings as to officers' motivations to secure the search warrant); *United States v. Swope*, 542 F.3d 609, 616 (8th Cir. 2008) ("The district court's ultimate finding of fact—that the officers would have applied for the warrant regardless of the illegal entry—is not clearly erroneous. As such, the independent source doctrine's first requirement is met."), *United States v. Saelee*, 51 F.4th 327, 335 (9th Cir. 2022) ("[T]here is no clear error in the district court's factual finding that the agents' decision to seek the warrant was unaffected by the alleged Fourth Amendment violations." (citation omitted)), *United States v. Halliman*, 923 F.2d 873, 880 (D.C. Cir. 1991) (upholding suppression where the trial court made an explicit finding that officers were not prompted to obtain the warrant because of the evidence illegally obtained), *and United States v. Harling*, 705 F. App'x 911, 917–18 (11th Cir. 2017) (upholding suppression of evidence where trial court made finding that officer would have sought search warrant regardless of unlawfully obtained evidence).

20

violation.[5]

We have never had an occasion to apply *Murray* in a case where the independent source doctrine was applicable. While we tangentially discussed the independent source doctrine and *Murray* in *Williams*, we ultimately affirmed the trial court's decision to suppress the evidence at issue because the State violated the defendant's Fourth Amendment rights, the independent source doctrine was inapplicable, and the State could not satisfy the demands of the inevitable discovery doctrine. 372 Md. at 414–15, 418–27.[6]

---

[5] *See Katona*, 240 A.3d at 481; *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992); *State v. Lewis*, 809 P.2d 925, 930 (Alaska Ct. App. 1991); *State v. Wagoner*, 24 P.3d 306, 316 (N.M. Ct. App. 2001) (noting rule adopted under New Mexico's state constitution).

[6] In *Williams*, officers were preparing a warrant application for motel rooms occupied by a recently arrested drug suspect. 372 Md. at 395. Before completing the application, officers went to the motel, knocked, announced themselves as "maintenance[,]" heard movement behind the door, and entered without a warrant. *Id.* Upon entry, officers smelled and observed marijuana, arrested the defendant, and discovered cocaine on his person. *Id.* They communicated their observations to the officer drafting the warrant affidavit, who incorporated those observations into the statement of probable cause. *Id.* at 395–96. Law enforcement later obtained and executed the search warrant. *Id.* at 396. The defendant moved to suppress the evidence on the grounds that the seizure was unlawful. *Id.* at 398. The circuit court granted that motion, but the Appellate Court reversed. *Id.* at 398–99.

While we held that the police had unlawfully entered the motel rooms, we addressed the doctrines of independent source and inevitable discovery. *Id.* at 409–10. The former, we held, was inapplicable because the State, although it obtained the warrant and later executed it, failed to return an inventory of the property seized in accordance with Maryland Rule 4-601. *Id.* at 414 & n.7. Thus, we could not say that any of that evidence had been lawfully *reseized* pursuant to the warrant because the lack of a search inventory meant that the evidence had never been *initially seized*. *Id.* at 414–15. Turning to inevitable discovery, we applied a *Franks*-style excision to the tainted information contained within the warrant, holding that the warrant was a lawful means by which the evidence could have been obtained because the untainted information still established probable cause. *Id.* at 418–20. We nevertheless held that the State could not show by a

21

With this overview of pertinent Fourth Amendment principles, we now address what Mr. Founds does and does not argue. Mr. Founds did not pursue any argument concerning officer motivation in the Appellate Court or this Court. Where a remand was required in *Murray* to resolve the First Circuit's factually unsupported statement, remand is not required here because Mr. Founds failed to preserve that issue.

What Mr. Founds does argue is that the independent source doctrine applies only when police secure a warrant without using any evidence obtained from an unconstitutional search. Relying on *Segura* and *Murray*, Mr. Founds argues that the Supreme Court applies the independent source doctrine "only where police secured a warrant without using any evidence that was obtained pursuant to an unconstitutional search or seizure." Only in that situation, he argues, "can a reviewing court be sure that tainted evidence did not affect a magistrate's decision to issue a warrant." Because the affidavit here contained observations from the warrantless entry, Mr. Founds claims that the doctrine is inapplicable regardless of whether the remaining untainted information independently establishes probable cause. In the alternative, Mr. Founds argues that, should we adopt an excision-style methodology, we "should require the State to establish that it was more likely than not that the magistrate would have actually issued the warrant

---

preponderance of the evidence that it would have discovered, at the time it would have executed the search warrant, the marijuana on the bed and that the defendant, who had cocaine on his person, also would have been in the motel room at that time. *Id.* at 426–27. In other words, under the inevitable discovery doctrine, the State satisfied the first step by showing that it had a lawful means to obtain the evidence (the warrant), but it otherwise could not satisfy the second step by showing by a preponderance of the evidence that the State would have discovered the same evidence that it illegally seized in the first instance.

22

in question if police had not violated the Fourth Amendment[.]" As explained more thoroughly below, we reject Mr. Founds' arguments.

### 1. Federal circuit courts' universal interpretation of *Murray*'s second prong

All the federal circuit courts to have considered *Murray*'s second inquiry have interpreted it to endorse an objective test in line with *Franks* to answer whether tainted information affected the decision of the issuing judge. *See, e.g.*, *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005) ("We hold that the Court in *Murray* did not intend to add anything to the pre-existing *Franks* approach to evaluating warrant applications containing tainted information when it stated that courts should ask whether such information 'affected [the Magistrate's] decision to issue the warrant.' Thus, when faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." (citation omitted)); *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993) (reframing *Murray*'s inquiry into the warrant's effect on the magistrate as whether the warrant is "supported by probable cause derived from sources independent of the illegal entry[]"), *cert. denied*, 510 U.S. 959 (1993); *United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir. 1992) ("[T]he Court's use of 'affect' in *Murray* must be understood to signify affect in a *substantive* manner. Thus, the fact that an application for a warrant contains information obtained through an unlawful entry does not *per [se]* indicate that the improper information 'affected' the [issuing judge's] decision to issue the warrant and thereby vitiate the applicability of the independent source doctrine."), *cert. denied*, 506 U.S. 958 (1992); *United States v.*

*Walton*, 56 F.3d 551, 554 (4th Cir. 1995) ("In assessing whether the information affected the decision to issue the warrant, the district court, appropriately following *Franks* . . . , examined the search warrant affidavit absent the illegally-obtained information, to determine whether the untainted portion of the affidavit set forth probable cause." (citations omitted)); *United States v. Restrepo*, 966 F.2d 964, 970 (5th Cir. 1992) ("[W]e find no other post-*Murray* circuit cases concerning the independent source doctrine that have interpreted *Murray* as refuting their pre-*Murray* holdings that inclusion of illegally-acquired information on a warrant affidavit does not invalidate the warrant if the affidavit's other averments set forth probable cause." (citations omitted)), *cert. denied sub nom. Pulido v. United States*, 506 U.S. 1049 (1993); *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) ("[A]uthority from this and other circuits, as well as the principles underlying the *Murray* rule, support an interpretation of the independent source rule that incorporates consideration of the sufficiency of the untainted affidavit to see if probable cause exists without the tainted information."), *cert. denied*, 546 U.S. 813 (2005); *United States v. Markling*, 7 F.3d 1309, 1316 (7th Cir. 1993) ("Other than the sentence fragment . . . , there is no indication in *Murray* that the Court intended to reject—or even that it was considering—the prevailing *Franks*-based rule. A rule focusing on the tainted information's actual influence on a particular magistrate would be inconsistent with *Franks*[.]"); *United States v. Swope*, 542 F.3d 609, 614 (8th Cir. 2008) ("Invalidating a search warrant because the magistrate was affected in some minor way by tainted information, when the warrant would have been granted even without the tainted information would work against the principle that the fruit of the poisonous tree

24

doctrine not be used to place the government in a worse position than it would have been in absent its illegal conduct." (citation modified)), *cert. denied*, 555 U.S. 1145 (2009); *United States v. Salas*, 879 F.2d 530, 537 (9th Cir. 1989) ("The district court concluded that, after deleting all references to the [tainted information], the untainted information known to the officers prior to the initial entry . . . derived from an independent source and constituted sufficient facts to establish probable cause for the warrant to issue. We agree with the district court[.]"), *cert. denied*, 493 U.S. 979 (1989); *United States v. Chaves*, 169 F.3d 687, 693 (11th Cir. 1999) ("Even discounting that portion of the affidavit describing information uncovered during the unconstitutional warrantless entry, the balance of the affidavit supports a finding of probable cause."), *cert. denied*, 528 U.S. 1048 (1999); *United States v. Halliman*, 923 F.2d 873, 880 (D.C. Cir. 1991) ("The [district] court also held that . . . 'under an objective standard, [the tainted] information . . . could not have affected the . . . judge's decision to issue the emergency warrant.' We agree with the district court's conclusion that 'there [were] overwhelming independent grounds for probable cause[.]'" (citations omitted)). We discuss a few of these cases in depth.

In *Herrold*, the United States Court of Appeals for the Third Circuit considered whether the district court erred in granting a motion to suppress evidence based upon a search warrant application that contained information discovered during an earlier unlawful entry. 962 F.2d at 1133. The district court interpreted the second prong in *Murray*—"or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant"—to mean that because the application for

25

the warrant contained information discovered during the unlawful entry, this information necessarily "affected" the magistrate's decision to issue the warrant. *Id.* at 1141.

In rejecting the district court's approach, the Third Circuit determined that such an interpretation "conflict[ed] with the policy underlying the independent source doctrine—namely, that the police not be placed in a worse position than they would have been in had they not engaged in illegal activity." *Id.* The court explained:

> To promote this interest, the Court's use of "affect" in *Murray* must be understood to signify affect in a *substantive* manner. Thus, the fact that an application for a warrant contains information obtained through an unlawful entry does not *per [se]* indicate that the improper information "affected" the [issuing judge's] decision to issue the warrant and thereby vitiate the applicability of the independent source doctrine. Rather, if the application contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they observed during the initial entry.

*Id.* at 1141–42. The Third Circuit concluded by stating:

> Importantly, our result, which harmonizes the tainted warrant and independent source doctrines, will not provide the police with an incentive to avoid the warrant requirement. Rather, by its very nature it is only applicable where the police have in fact obtained a warrant. In addition, it will not give the police incentive to search first without a warrant, because any information discovered in an unlawful search is useless to the police in a subsequent warrant application. Moreover, our result is dependent upon our conclusion that the police would have obtained the warrant even if [the officer] had not made his original entry.

*Id.* at 1144.

In *Restrepo*, the United States Court of Appeals for the Fifth Circuit also considered whether the phrase in *Murray*—"or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant"—required

26

the district court to consider the *actual* effect of the illegally acquired information in the officer's warrant affidavit on the decision of the *particular* magistrate who issued the search warrant. 966 F.2d at 969. The district court had undertaken such an interpretation and granted the defendant's motion to suppress. *Id.* at 968. Although the Fifth Circuit acknowledged that the district court's interpretation was "at least facially consistent with . . . *Murray*," the court determined that the Supreme Court "never intended th[at] interpretation." *Id.* at 969.

The court observed that "[p]rior to *Murray*, this and other circuits had adopted variations on the rule that evidence obtained in an illegal search is first excised from the warrant affidavit, after which the expurgated version is evaluated for probable cause." *Id.* The court explained that "[t]his approach was simply the logical extension of the rule in *Franks* that warrant affidavits containing *false statements* are to be afforded this treatment." *Id.* In the Fifth Circuit's view:

> Nothing in *Murray*—other than perhaps the unfortunate sentence fragment in dispute here—indicates that the Supreme Court intended to reject the prevailing *Franks*-inspired rules. The relevant phrase ("affected his decision to issue the warrant"), almost certainly was simply a paraphrase—albeit a confusing one when considered noncontextually—of the approach long sanctioned in the circuits.

*Id.* at 970 (footnote omitted). The Fifth Circuit also noted that it had found "no other post-*Murray* circuit cases concerning the independent source doctrine that have interpreted *Murray* as refuting their pre-*Murray* holdings that inclusion of illegally acquired information on a warrant affidavit does not invalidate the warrant if the affidavit's other averments set forth probable cause." *Id.* (footnote omitted).

In *Swope*, the United States Court of Appeals for the Eighth Circuit also considered and rejected the defendant's argument that *Murray*'s second prong requires a literal and subjective interpretation in which a reviewing court must consider whether the tainted information in any way "affected [the magistrate's] decision to issue the warrant." 542 F.3d at 614 (alteration in original) (quoting *Murray*, 487 U.S. at 542). The court stated that "no circuit has adopted such a reading, and [it] decline[d] to do so[.]" *Id.* The Eighth Circuit explained the rationale for the federal circuits' overwhelming rejection of a "strictly literal interpretation of the second *Murray* prong," stating:

> Invalidating a search warrant because the magistrate was affected in some minor way by tainted information, when the warrant would have been granted even without the tainted information, would work against the principle that the fruit of the poisonous tree doctrine not be used to place the government in a worse position than it would have been in absent its illegal conduct. [The defendant's] approach would constitute a *per se* rule in favor of suppression when the supporting affidavits contain tainted information, thereby undermining the independent source doctrine's foundational goal of putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. We therefore read the second prong to signify affect in a *substantive manner*, i.e., whether removing the tainted information also removes the basis for probable cause.

*Id.* at 614 (citation modified). The court further noted that the phrase in question from *Murray* was "peripheral to *Murray*'s holding[,]" and that "[o]ther circuits have reasoned that the offhand nature of the phrase—and its easy characterization as dicta—suggests that the Court did not intend for that phrase to displace the practice of redacting problematic information from search warrant application affidavits and analyzing the remainder for probable cause under *Franks*." *Id.* (citations omitted). The court acknowledged that, "[a]lthough the context in *Franks* differs from the present

28

context[] . . . []other circuits have found that difference to be insufficient to justify a departure from the traditional *Franks*-based redaction analysis." *Id.* (citation omitted). The court further observed that, "[e]ven after *Murray*, probable cause continues to be the benchmark for evaluating tainted affidavits." *Id.* (citations omitted).

The federal courts of appeals' rationale for linking *Murray* with *Franks*' excision methodology for considering probable cause in a warrant after removing the "taint" is sound and consistent with the rationale underlying *Murray*. "The idea behind *Murray* and related cases is that police who carry out a search that they should not have carried out should be put in the same, *but no worse*, position than they would have been absent any error or misconduct." *Jenkins*, 396 F.3d at 758 (citations omitted). We agree with the uniform determination of the federal circuit courts to have reached the issue that "[i]nvalidating a search warrant because the magistrate was affected in some minor way by tainted information, when the warrant would have been granted even without the tainted information, would put the police in a worse position than they would have been in had they not presented the tainted information to the magistrate." *Id.* at 758–59; *see also id.* at 759 ("[Because] knowingly including a false statement in a warrant affidavit seems the functional equivalent of (if not an even more serious transgression than) including in the affidavit knowledge of the facts illegally obtained, then it makes sense to deal with cases such as the present one in the same fashion utilized by the Supreme Court in *Franks*." (citation modified)); *United States v. Johnston*, 876 F.2d 589, 594 (7th Cir. 1989) (Posner, J., concurring) (noting that the Supreme Court in *Franks* assumed without holding that "a search warrant procured on the basis of an affidavit that contains

29

unlawfully obtained information is nevertheless valid if the lawfully obtained information in the affidavit is sufficient by itself to establish probable cause for the search[]" and collecting cases concurring in this rule).

## 2. Framework for applying *Murray*'s two-pronged test when a warrant application includes both tainted and untainted information

With the above principles in mind, we adopt the following framework. When a defendant challenges a search warrant application or affidavit on the ground that the warrant contains unlawful information arising from a previous illegal search, the suppression court must apply the following two-pronged test and determine: (1) "if the [officers'] decision to seek the warrant was prompted by what they had seen during the initial entry[;]" and (2) "if information obtained during that entry was presented to the [issuing judge] and affected his [or her] decision to issue the warrant." *Murray*, 487 U.S. at 542. Both questions must be answered in the affirmative for the warrant to be an independent source exception to the exclusionary rule.

With respect to the first prong, "determin[ing] whether the warrant was independent of the illegal entry," the suppression court "must ask whether it would have been sought even if what actually happened had not occurred[.]" *Id.* at 542 n.3. The first prong of *Murray* is a subjective, fact-based inquiry that the suppression court is in the best place to determine. *Id.* at 543 (explaining that it is the district court's function to determine the facts concerning whether the officers' decision to seek the warrant was prompted by what they had seen during the initial entry); *see also United States v. Khabeer*, 410 F.3d 477, 484 (8th Cir. 2005) (remanding the case because the district court

30

had not made a finding one way or the other about whether the police would have sought a warrant absent the illegally obtained information); *Restrepo*, 966 F.2d at 973 (remanding the first prong of the analysis to the district court after concluding that *Murray* requires the trier of fact to determine whether the illegal search motivated the officers to seek the search warrant). Although the first *Murray* prong is articulated as a subjective test, "it should not be proven by purely subjective means." *Dessesaure*, 429 F.3d at 369. "In making the factual determination as to the police officers' intent," the suppression court "is not bound by after-the-fact assurances of their intent, but instead must assess the totality of the attendant circumstances to ascertain whether those assurances appear 'implausible.'" *Id.* (quoting *Murray*, 487 U.S. at 540 n.2).

The second prong is an objective analysis and requires that the reviewing court excise the tainted facts and conclusions and determine whether the remaining untainted evidence would provide a warrant-issuing judge with probable cause to issue a warrant. *See Restrepo*, 966 F.2d at 970; *Herrold*, 962 F.2d at 1143; *Dessesaure*, 429 F.3d at 367; *Swope*, 542 F.3d at 616.

If the suppression court determines (1) that the officers' decision to seek the search warrant was not prompted by what they saw during the illegal entry; and (2) after redacting the references to the tainted facts or conclusions, the remaining untainted evidence would provide a warrant-issuing judge with probable cause to issue a warrant, then the evidence seized is admissible pursuant to the independent source doctrine.

**3. Disagreement with the Principal Dissent**[7]

The Principal Dissent fashions a mostly subjective, partially objective test. Under the Principal Dissent's test, "the State must prove that none of the tainted information included in the warrant application was relevant to the probable cause determination. Put another way, the State must establish that a reasonable judicial officer would conclude that none of the tainted information increases the quantum of probable cause set forth in the warrant application." Dissenting Op. of Biran, J., at 29.

In rejecting the objective test, the Principal Dissent asserts, among other things, that (1) the *Franks* methodology is not a "good fit for the second part of the *Murray* test[,]" *id.* at 15; (2) if the *Murray* Court had "intended that its second prong determine whether the tainted information was essential to the probable cause determination, it likely would have expressly referred to *Franks* or to excision in some manner[,]" *id.* at 16; (3) the objective analysis "creates affirmative incentives for law enforcement officers to engage in unreasonable searches and seizures[,]" *id.* at 26, and "undermines the very purpose of the exclusionary rule[,]" *id.* at 27; and (4) the objective analysis is inconsistent with *Murray*'s test in which the Court "made clear that including tainted information in an affidavit imposes a burden on the State beyond merely showing the reviewing court that probable cause could have been found based on untainted information[,]" *id.* at 23. We respectfully disagree with the Principal Dissent.

First, as discussed above, all of the federal circuit courts that have addressed the

---

[7] We refer to the opinion authored by Justice Biran as the "Principal Dissent." In her separate dissent, Justice Watts raises similar points, as does Mr. Founds in his briefing in this Court. For conciseness, we discuss just the Principal Dissent.

issue have interpreted *Murray* in a manner that harmonizes the *Franks* excision analysis with the independent source doctrine. Notably, prior to *Murray*, federal circuit courts had been applying an objective *Franks* excision approach to analyze whether a search warrant that included tainted information affected the issuing judge's decision to issue a warrant. *See Restrepo*, 966 F.2d at 969 n.10; *Dessesaure*, 429 F.3d at 366 ("Every circuit to consider the question has held that the Court's instruction in *Murray* to analyze whether the tainted information affected the magistrate's decision to issue the warrant did not mean to change the dominant pre-existing approach under *Franks*." (citations omitted)). The federal circuit courts have been universally applying the *Franks* methodology as part of the second *Murray* prong for decades. For the reasons set forth above, we find the federal circuit courts' rationale to be very persuasive. If, under *Franks*, the excision analysis is appropriate where an officer knowingly includes a false statement in an affidavit, it is illogical to apply a more stringent standard when the affidavit includes knowledge of facts obtained pursuant to an unlawful search but where the officer did not know those facts to be tainted.

Excising the problematic material and asking whether probable cause survives is a workable, objective means of answering that question regardless of whether the material to be excised is a false statement or information unlawfully obtained. That practical convergence is why courts have borrowed *Franks*' excision methodology within the independent source context. *See United States v. Huskisson*, 926 F.3d 369, 375 (7th Cir. 2019) ("With *Murray* as our direction, we apply the *Franks*-style analysis . . . because doing otherwise would put the government in a worse place than they would have been

33

absent the illegal search." (citation omitted)); *Swope*, 542 F.3d at 614 ("Although the context in *Franks* differs from the [Fourth Amendment violation] context . . . other circuits have found that difference to be insufficient to justify a departure from the traditional *Franks*-based redaction analysis." (citing *Dessesaure*, 429 F.3d at 366–67)); *Restrepo*, 966 F.2d at 970 ("Nothing in *Murray*—other than perhaps the unfortunate sentence fragment in dispute here—indicates that the Supreme Court intended to reject the prevailing *Franks*-inspired rules. The relevant phrase ('affected his decision to issue the warrant'), almost certainly was simply a paraphrase—albeit a confusing one when considered noncontextually—of the approach long sanctioned in the circuits." (footnote omitted)); *State v. Chaney*, 723 A.2d 132, 136 (N.J. Super. Ct. App. Div. 1999) ("[W]e hold that *Murray* did not change the rule that the validity of a search warrant issued on the basis of an affidavit containing unlawfully obtained information turns on whether the other lawfully obtained information set forth in the affidavit establishes the probable cause required to justify the search.").[8]

Second, there was no reason for the *Murray* Court to comment on *Franks* or an excision analysis because the warrant in question did not contain any tainted information.

---

[8] In the Principal Dissent's view, excision shows only that the warrant could have issued on the untainted affidavit, not that it would have. Dissenting Op. of Biran, J., at 29. The distinction dissolves once one considers the nature of the decision for the issuance of a warrant. A neutral and detached judge presented with an affidavit that establishes probable cause issues the warrant. That is what the probable cause standard requires and what our ordinary, deferential review of warrants presupposes. *See Gates*, 462 U.S. at 238–39. The Principal Dissent treats this as a question about what one particular judge would have done. It is not. If the untainted facts establish probable cause, the warrant would have issued—because that is what a probable cause showing requires of any neutral judge. There is no counterfactual about which to speculate. And for that reason, the Principal Dissent's proposed test is unworkable.

Third, the Principal Dissent's assertion that an objective analysis "creates affirmative incentives for law enforcement to engage in unreasonable searches and seizures[]" is overstated. Dissenting Op. of Biran, J., at 26. According to the Dissent:

> Officers who believe they likely have probable cause to obtain a warrant may be tempted to enter a home without one, confirm that there is evidence of crime on the premises, apply for a warrant that includes their observations to ensure its issuance, and then return to the property and seize the evidence under the issued warrant. After today's decision, officers can be confident that they will not be worse off and may very well be better off for having entered the home illegally.

*Id.* at 26–27. We disagree. Once again, it is worth noting that the objective analysis has been applied by the federal circuit courts for decades in this context, and the Supreme Court has applied the same framework in the *Franks* context, involving knowing misstatements. There is no evidence that the objective excision analysis has led to a rise in unlawful law enforcement searches.

Fourth, in support of its test, the Principal Dissent places too much emphasis on part of a statement in *Murray* that it takes out of context. The Principal Dissent relies on a discussion in the opinion in which Justice Scalia rejected Mr. Murray's argument that, under the independent source doctrine, police would be encouraged to engage in unlawful police searches. In rejecting Mr. Murray's argument, Justice Scalia said:

> We see the incentives differently. An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, *since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it*.

35

*Murray*, 487 U.S. at 540 (emphasis added). According to the Principal Dissent, in this passage, "Justice Scalia thus made clear that including tainted information in an affidavit imposes a burden on the State beyond merely showing the reviewing court that probable cause could have been found based on untainted information." Dissenting Op. of Biran, J., at 23; *see also id.* at 29 (reiterating that "Justice Scalia made clear in *Murray* that the inquiry is not whether the warrant affidavit, stripped of the tainted information, provides probable cause for the search warrant[]"). We disagree. As discussed, *Murray* did not involve a search warrant that contained tainted information, so *Murray* does not make anything "clear" about the application of the independent source rule to a search warrant affidavit containing tainted information. As the Fifth Circuit observed in *Restrepo*, "even had the plurality in *Murray* intended to question the established *Franks*-derived approach, its discussion of this point would constitute mere dictum given that tainted information was not even offered to the magistrate judge in that case." 966 F.2d at 970 n.13. The Principal Dissent places too much emphasis on a phrase that it takes out of context.

Finally, the Principal Dissent's test is too narrow and would place law enforcement officers in a much different and *worse* position than they would have been if they had not undertaken the unlawful search in the first instance. If the Principal Dissent's proposed test means that suppression is required if the tainted information was relevant to the determination of probable cause, then the Principal Dissent's test is a per se rule of suppression in application if not in name. Relevance, by definition, is something that makes a fact more likely than not. *See* Md. R. 5-401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is

of consequence to the determination of the action more probable or less probable than it would be without the evidence."). An officer's firsthand observation of contraband inside a residence will virtually always do so. But the inverse is *far* from true. That is, one cannot automatically conclude that probable cause objectively would be lacking without the tainted information's presence. At bottom, the Principal Dissent's test is a per se rule that if any tainted information is included in an affidavit, the exclusionary rule applies, regardless of whether law enforcement was aware that the information was tainted or believed its search to be lawful and justified under the Fourth Amendment, and regardless of whether the non-tainted information established overwhelming probable cause. Invalidating a search warrant because it contains any tainted information that is "relevant to the probable cause determination[,]" as the Principal Dissent's test requires, *see* Dissenting Op. of Biran, J., at 31, is inconsistent with the rationale behind *Murray* and the related cases. *See Murray*, 487 U.S. at 542; *Nix*, 467 U.S. at 443.[9]

The Principal Dissent hypothesizes that it is possible that tainted information

---

[9] The Principal Dissent contends that our reliance (as well as the federal circuit courts' reliance) on the "worse off position" language in *Nix*, which the Supreme Court quoted in *Murray*, is "flaw[ed]" and "misplaced." Dissenting Op. of Biran, J., at 20. We agree with the Principal Dissent that that phrase "explains why the independent source exception to the exclusionary rule exists in the first place[.]" *Id.* at 21. Of course, it is the case that the exclusionary rule places the government in a worse position for conducting an unlawful search by excluding the evidence. To be clear, we do not read *Murray* to suggest that law enforcement should *never* be put in a worse position for undertaking an unlawful search. Rather, the point *Murray* makes is that *where there is an independent source*, law enforcement should not be placed in a worse position due to the unlawful search than they would have been based upon the independent source. In our view, the issue is how to determine whether the source was independent—by excision, or by the Principal Dissent's relevance test. And, as we set forth here, we believe that the excision method is most consistent with *Murray*'s rationale.

contained in a search warrant might be irrelevant to a probable cause determination. *See* Dissenting Op. of Biran, J., at 29 ("In most cases where officers have included tainted information in a warrant application, [my test] will probably be a difficult burden for the State to meet, as well it should be." (citation omitted)). Although that is conceptually possible, it will rarely, if ever, be the case in practice. For that to be true, it must first be the case that a law enforcement officer decides to include entirely irrelevant information in a warrant affidavit. Of course, any information a law enforcement officer decides to include in an affidavit is necessarily information the officer believes to be relevant to the probable cause determination. There is no other reason to include such information in a warrant affidavit. Although we do not doubt that there are cases in which a reviewing court decides that information a law enforcement officer thought to be relevant actually is not, that will be the unusual case. Beyond that, the Principal Dissent's test would still be satisfied only if it just so happens to be the case that the same irrelevant information— and only that information—is exactly co-extensive with the tainted information in the affidavit. Such a scenario is, at best, extremely unlikely. The Principal Dissent's test is functionally equivalent to a strict standard by which the independent source doctrine can never apply if any tainted information appears in an affidavit.[10] That does not accord with

_____

[10] To highlight our concern about the Principal Dissent's test in practical terms, say in this case that the officers had seen the FedEx package hauled into the apartment, and had not lost the car along the way. They put that information in the affidavit, but still go ahead with the "protective sweep" and also include in the affidavit the other observations. There probably is not a judge in the State who would not have found probable cause with the information about the FedEx package being intercepted, identified as containing marijuana, and viewed being hauled into the apartment. By the Principal Dissent's test, however, the other information about drugs in the apartment

38

the requirements or the logic of *Murray*. Under the standard set forth by the Supreme Court, which we are bound to follow, where there is an independent source, although the "government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *Murray*, 487 U.S. at 542. The Principal Dissent's test plainly does just that.

**4. Applying a *Franks'* excision methodology to a warrant containing tainted information, the trial court gives no deference to the issuing judge's initial probable cause determination, and an appellate court on review utilizes a de novo standard**

Finally, Mr. Founds takes issue with the fact that both the circuit court and the Appellate Court used a deferential standard, asking whether, after excising the tainted information, there was a substantial basis for the issuing judge to find probable cause. In his view, even if we adopt an excision methodology in the independent source context, remand is necessary for the State to prove "*through evidence* that it is more likely than not that the magistrate would have actually issued the warrant in question had the officers not included the unlawfully obtained facts." We share Mr. Founds' concerns about the lower courts' standard used in this case, but we reject his proposed solution, as there is no need to relitigate the motion to suppress.

Consistent with what we previously stated in cases where we similarly relied on *Franks'* excision methodology, the proper inquiry in such an exercise is whether, "after factoring out the tainted information, . . . the information remaining established probable

---

would be "relevant," and so, all the evidence would need to be suppressed. We do not read *Murray* to support that result. We think that becomes a burden that passes from onerous to impossible.

cause for the issuance of the warrant[.]" *Klingenstein v. State*, 330 Md. 402, 415 (1993); *see also Holmes v. State*, 368 Md. 506, 517 (2002) (holding that "[i]f, upon that appraisal, we conclude, as we shall, that, even without any reference to the [tainted information], the application suffices to establish probable cause for the warrant, the validity of the initial intrusion becomes irrelevant.").[11] The deferential "substantial basis" standard, applicable to ordinary review of an issuing judge's probable cause finding, presumes that the judge made a finding based on truthful information free of any constitutional violations. *See Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) ("[T]he duty of a reviewing court [determining whether a magistrate issuing a warrant was correct] is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." (citation modified)).

In the excision context, where a warrant affidavit has been infected either by untruthful information or information obtained in violation of the Fourth Amendment, that predicate is absent. As such, there is no *legitimate finding* to which a reviewing court can defer, so the reviewing court must make an independent assessment. And, on appellate review, the suppression judge's determination of whether probable cause exists

---

[11] To clarify, *Klingenstein* and *Holmes* were not cases decided under the independent source doctrine, and those cases cited neither that doctrine nor *Murray*. We do not cite *Klingenstein* and *Holmes* for the proposition that *Murray*'s second prong requires an objective, *Franks*-like excision analysis in the first instance. We cite these cases only for the proposition that, once it is determined that *Franks*' excision methodology is the appropriate analysis to apply, it is the suppression judge who makes a determination as to whether probable cause exists after excising the tainted information, without any deference to the issuing judge's determination or consideration of what the issuing judge might have done if presented with an untainted warrant application.

after the problematic information is excised from the warrant is reviewed de novo.[12]

To be clear, de novo review here fashions no new standard. Deference to an issuing judge's probable cause determination presupposes a neutral judicial officer acting upon a lawfully assembled application. *See Gates*, 462 U.S. at 236, 238–39. When the application was infected by information that should never have reached the issuing judge, that predicate is gone, and with it the reason for deference. What remains—whether a given set of undisputed averments establishes probable cause—is a pure question of law, which we review de novo, just as with every question of law. That no prior decision has recited a de novo standard for this setting is, therefore, unsurprising. No authority is needed for the axiom that an appellate court resolves a legal question without deference. The only feature peculiar to this context is the recognition that the usual basis for deference is absent. We are unpersuaded by either Mr. Founds' or the Principal Dissent's proposed alternative.[13]

---

[12] Although the lower courts applied an incorrect deferential standard, because we reach the same result utilizing the proper de novo standard of review (detailed below), it is not necessary to vacate the Appellate Court's opinion and remand the case back to that court.

[13] The Principal Dissent argues that de novo review is susceptible to hindsight bias—that a reviewing judge who knows evidence was found cannot truly assess whether the untainted warrant alone would have supported probable cause and will tend to assign a higher probability to the outcome after the fact. Dissenting Op. of Biran, J., at 33–34. This concern is, however, not unique to de novo review under the excision methodology. Suppression hearings necessarily occur after a search and, often, after incriminating evidence has been seized. Courts nevertheless routinely make backward-looking legal determinations about the validity of searches based on the facts known at the relevant time. More so, we have already recognized as much in the excision context. *See Klingenstein*, 330 Md. at 414–15 ("It follows that the culling of tainted information and the determination of whether the remaining untainted information is adequate to show

41

We now apply these principles to Mr. Founds' case.

**B.      *Excising the Tainted Information, the Warrant Affidavit Contained Probable Cause to Serve as an Independent Source***

Assuming—without deciding—that the initial warrantless entry into Mr. Founds' apartment was unlawful, the question is whether the warrant affidavit, with the unlawful evidence excised, establishes probable cause. We hold that it does.

Probable cause to support the issuance of a search warrant exists where, given the totality of the circumstances set forth in the affidavit, there is "a fair probability that contraband or evidence of a crime will be found in a particular search." *Patterson v. State*, 401 Md. 76, 89–90 (2007) (quoting *Greenstreet v. State*, 392 Md. 652, 667–68 (2006)). Determining whether probable cause exists requires making a "practical and common-sense decision[]" based on the information presented within the four corners of the affidavit. *Rovin v. State*, 488 Md. 144, 184 (2024); *see also Doering v. State*, 313 Md. 384, 403 (1988) ("The rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion." (citing *Sterling v. State*, 248 Md. 240, 245 (1967))).

In this case, applying the excision methodology, we remove from the affidavit the observations attributable to the warrantless entry into Mr. Founds' apartment— specifically, the plain-view observations of the heat-sealed bags and the brown box

---

probable cause is also a matter for the hearing judge in the first instance."); *Holmes*, 368 Md. at 517 ("We know precisely what would have to be excised . . . and we can quite easily determine, as part of our Constitutional appraisal of the ultimate issue, whether, without that reference, the application suffices to establish probable cause.").

consistent with the intercepted FedEx package. We find that the excised information is not needed to establish probable cause and that the remaining untainted information in the affidavit is substantial. FedEx employees intercepted a suspicious package containing 17 heat-sealed bags, totaling 19.6 lbs. of marijuana. Detectives conducted a controlled delivery of the package and observed Mr. Founds retrieving that package in a grey Kia. Detectives followed Mr. Founds, temporarily lost sight of him, but located an apartment associated with him where they observed the same grey Kia parked outside. Law enforcement verified with the apparent owner of the apartment that Mr. Founds was renting the apartment. When Mr. Founds opened the apartment door, law enforcement detected the smell of raw marijuana and observed that Mr. Founds appeared to be "overly nervous[,] . . . trembling[,] and covered in sweat."

Mr. Founds argues that the odor of marijuana also must be removed from the warrant application because officers exceeded their implied license to remain on the curtilage of his apartment by repeatedly knocking and announcing themselves for 10–12 minutes, constituting an independent Fourth Amendment violation under *Florida v. Jardines*, 569 U.S. 1 (2013). As the State correctly notes, however, Maryland Rule 4-252(a)(3) categorizes a motion to suppress based on an unlawful search as a mandatory one that must be raised "in conformity with this Rule and if not so raised [is] waived" unless good cause exists. A motion filed under Rule 4-252 "shall state the grounds upon which it is made, and shall set forth the relief sought." Md. R. 4-252(e). Rule 4-252's purpose is "to alert both the court and the [State] to the *precise* nature of the complaint," so that the State has "a fair opportunity to defend against it" and so "the court

understand[s] the issue before it." *Ray v. State*, 435 Md. 1, 14 (2013) (emphasis added) (quoting *Denicolis v. State*, 378 Md. 646, 660 (2003)).

In *Ray*, we declined to address the merits of the petitioner's Fourth Amendment claim. *Id.* at 13. There, the petitioner filed an omnibus motion "contain[ing] no supporting factual allegations, legal arguments, or citations to authority[,]" failing to satisfy Rule 4-252(e)'s specificity requirement. *Id.* at 15. Although the petitioner eventually satisfied Rule 4-252(e) when he supplemented the omnibus motion, arguing that two separate unconstitutional stops occurred, because neither was supported by reasonable suspicion, *id.*, those arguments did "not come close to raising [the issue of an] unlawful arrest as a ground for suppression of the evidence," which was the argument the petitioner pressed in this Court, *id.* at 16. In *Ray*, the petitioner "did not raise the issue of probable cause to arrest in his written motion or at the hearing, and he did not otherwise allude to that theory for suppression of the evidence." *Id.* at 17.

So too here. In his motion to suppress, Mr. Founds stated that Cpl. Converse "approached [Mr. Founds'] residence and knocked on a door. Eventually Mr. Founds exited the door and closed [the] same behind him. Cpl. Converse claims to have smelled the odor of marijuana when Mr. Founds exited the residence." Mr. Founds argues that "[b]ased on law enforcement's observations *made during the search of the residence*," law enforcement authored a search warrant. (Emphasis added). Nowhere in his motion to suppress did Mr. Founds allege that law enforcement's presence outside his apartment— in and of itself—violated his Fourth Amendment rights or that any observations during their prolonged presence contributed to the issuing judge's determination that probable

44

cause existed. Nor did Mr. Founds seek any relief for any such hypothetical violation. To be sure, at the suppression hearing, the circuit court specifically asked Mr. Founds' counsel, "assum[ing] for the sake of argument" that excision was the proper route, what facts should be excised from the warrant application. Counsel confirmed that the "following observations[]" should be excised: "numerous individual heat sealed bags containing marijuana THC that appeared to be in approximate one-pound increments and were consistent with the heat sealed bags investigators had seen per the original package," and "a large brown box that was consistent with the original package." Thus, even at the suppression stage, the parties agreed as to what observations should be excised from the warrant application if the circuit court were inclined to engage in that analysis.

Mr. Founds, thus, sought to suppress only law enforcement's observations once inside and, in doing so, has not complied with Rule 4-252(e) regarding his argument about the odor of marijuana. *See Ray*, 435 Md. at 14–19. Thus, when we assume— without deciding—that law enforcement's entry into Mr. Founds' apartment violated the Fourth Amendment, that assumption carries with it for purposes of our excision analysis only that for which Mr. Founds has asked: excision of what officers observed in plain view in his apartment. No more, no less.[14]

---

[14] As a failsafe, Mr. Founds argues that we should address this issue by exercising our discretionary review under Maryland Rule 8-131(a). We will not exercise that discretion here. As we stated in *Ray*, "considerations of both fairness and judicial efficiency ordinarily require" that challenges to a circuit court's ruling "be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to

45

The remaining information establishes a fair probability that evidence of criminal conduct would be found inside Mr. Founds' apartment, and the record supports that the officers knew that they would be seeking a warrant. While Mr. Founds argues that the remaining information is only circumstantial, Maryland has never required direct evidence to convict, and it also does not require it to execute a search. *See State v. Smith*, 374 Md. 527, 534 (2003) ("A valid conviction may be based solely on circumstantial evidence." (citing *Wilson v. State*, 319 Md. 530, 537 (1990))). We hold that, after excising the tainted information under the independent source doctrine, the search warrant establishes probable cause. That too is supported by the record below. The evidence seized pursuant to the warrant, therefore, need not be suppressed.

**C.** **The State Introduced Sufficient Evidence to Support Mr. Founds' Possessory Convictions**

On the issue of the sufficiency of the evidence, Mr. Founds argues that the State advanced the legally deficient theory that "*any* contraband found *anywhere* in the apartment could be imputed to [him.]" In Mr. Founds' view, the State's speculation "is not legally sufficient to establish that [he] possessed the items found in Bedroom 2[,]"

---

consider and respond to the challenge." 435 Md. at 23 (quoting *Chaney v. State*, 397 Md. 460, 468 (2007)). Both considerations counsel against exercising our discretion here. Because the State was not on notice that Mr. Founds was challenging the presence of the officers as a distinct Fourth Amendment violation, it had no opportunity to develop a contrary record—i.e., evidence about the duration of the officers' knocking, the customary path at this particular dwelling, the manner in which they stayed on and observed the property, or any other circumstances bearing on the *Jardines* analysis. *See Jardines*, 569 U.S. at 7–8. Nor was the issue decided by the trial court or addressed by the Appellate Court. Reaching the question now would deprive the State and the lower courts of the opportunity to consider and respond to it. We, therefore, decline to exercise our discretion under Rule 8-131(a).

namely the additional marijuana and the psilocyn mushrooms. Specifically, Mr. Founds argues that his possessory conviction for possessing over 50 pounds of marijuana (CR § 5-612(a)(1)) and psilocyn mushrooms (CR § 5-602(a)(2)) can stand *only if* the State proved that he had dominion and control over Bedroom 2. As to the body armor conviction (CR § 4-106), he argues that the agreed-upon statement of facts notes only that the body armor was "found in the residence." He argues that a factfinder cannot infer that an individual who resides in one bedroom necessarily has access to other bedrooms in a multi-bedroom dwelling and that the presence of drugs in a bedroom over which an individual does have dominion and control does not permit an inference that an individual has access to other bedrooms containing drugs.

The State posits that the "evidence here supported a reasonable inference that [Mr. Founds'] *entire* apartment was a stash location for a drug-dealing enterprise in which [he] participated." Specifically, the State believes that "[a] rational factfinder could infer that Mr. Founds constructively possessed all contraband found in [his] apartment, including that found in Bedroom 2." The State concedes that it is not seeking a "bright-line rule[]" "that a factfinder can *always* treat contraband found within the same residence as connected[.]" Rather, the State simply argues that, on the facts of this case, "the evidence supports a reasonable inference that *this* apartment was a stash location."

On the facts of this case, there was sufficient evidence for a rational factfinder to conclude that Mr. Founds' apartment was a stash house for an illegal drug operation and that he had dominion and control over all the contraband found within, supporting his convictions for his three possessory offenses.

47

All three of Mr. Founds' convictions criminalize the act of possession. *See* CR §§ 4-106, 5-602(a), 5-612(a)(1). For purposes of the convictions for psilocyn mushrooms and marijuana, "possess" means "to exercise actual or constructive dominion or control over a thing by one or more persons." CR § 5-101(v). In possession cases, the State need not prove that a defendant physically had the contraband on their person. *See State v. Gutierrez*, 446 Md. 221, 234 (2016) ("[T]he mere fact that the contraband is not found on the defendant's person does not necessarily preclude an inference by the trier of fact that the defendant had possession of the contraband." (quoting *Smith v. State*, 415 Md. 174, 187 (2010))). "But the 'evidence must show directly or support a rational inference that the accused did in fact exercise some dominion or control over the prohibited . . . drug in the sense contemplated by the statute, *i.e.*, that [the accused] exercised some restraining or directing influence over it.'" *State v. Leach*, 296 Md. 591, 596 (1983) (alterations in original) (quoting *Garrison v. State*, 272 Md. 123, 142 (1974)). In constructive possession cases, the State often will rely on circumstantial evidence. While cases may rest and verdicts stand entirely on circumstantial evidence, "[a] conviction resting on circumstantial evidence alone[] . . . cannot be sustained on proof amounting only to strong suspicion or mere probability." *Taylor v. State*, 346 Md. 452, 458 (1997) (citing *Wilson*, 319 Md. at 535–36).

An individual will "not be deemed to exercise 'dominion or control' over an object about which [they are] unaware. Knowledge of the presence of an object is normally a prerequisite to exercising dominion and control." *White v. State*, 363 Md. 150, 163 (2001) (quoting *Dawkins v. State*, 313 Md. 638, 649 (1988)). And a defendant's

48

knowledge must go to "both the presence and the general character or illicit nature of the substance[,]" both of which can be proven circumstantially. *Moye v. State*, 369 Md. 2, 14 (2002) (quoting *Dawkins*, 313 Md. at 651). In determining whether the factfinder could have made an inference that a defendant constructively possessed contraband, we have noted several factors to consider: (1) "the defendant's proximity to the drugs," (2) "whether the drugs were in plain view of and/or accessible to the defendant," (3) "whether there was indicia of mutual use and enjoyment of the drugs," and (4) "whether the defendant has an ownership or possessory interest in the location where the police discovered the drugs." *Smith*, 415 Md. at 198 (citations omitted). As to the third factor, "not only is actual use contemplated but also whether individuals participated in drug distribution." *Gutierrez*, 446 Md. at 237 (citing *Cook v. State*, 84 Md. App. 122, 135 (1990)). No one factor is, "in and of [itself], conclusive evidence of possession." *Smith*, 415 Md. at 198.

Our case law helps illustrate application of these principles and factors. In *Taylor*, we reversed the defendant's conviction for possession of marijuana. 346 Md. at 454. There, the defendant and four friends rented a hotel room, and the hotel manager eventually called the police on suspicion that the occupants were smoking marijuana. *Id.* at 454–55. An officer confronted the occupants and asked if marijuana was being smoked; an occupant said no and consented to a search of the hotel room. *Id.* at 455. At the time, the defendant was on the floor (the officer could not tell whether he was asleep or awake), and the police could observe clouds of smoke in the room that smelled like marijuana. *Id.* One of the occupants eventually surrendered a small bag of marijuana

from his personal carrying bag, and officers further found two more bags of marijuana, neither of which were linked to the defendant or his personal belongings. *Id.* at 455–56. The defendant was found guilty of possession of marijuana. *Id.* at 456.

We reversed, noting that "any finding that [the defendant] was in possession of the marijuana could be based on no more than speculation or conjecture." *Id.* at 459. The State had merely established that the defendant was present in a room where marijuana was smoked, that he personally knew it had been smoked, and that he was in close proximity to contraband that was concealed and belonged to others. *Id.* at 459–60.

In *Moye*, we again reversed a defendant's conviction for possession of drugs and associated paraphernalia where the defendant was staying at a house and was physically present in the basement for a brief period before law enforcement discovered the contraband. 369 Md. at 5–8. There, a married couple, Joseph and Yolanda Bullocks, rented their basement to another individual, Benson. *Id.* On the night in question, Yolanda's brother, the defendant, was present and may have been residing with the Bullockses at that time. *Id.* Police received a call that an assault with a knife had occurred at the Bullockses' residence; when they arrived, Yolanda exited the home and indicated that someone had cut her foot. *Id.* at 5 n.1, 6. Joseph and Benson, who also sustained cuts, exited the home, and Benson indicated that someone remained in the home. *Id.* at 6. Police initially observed the defendant on the first floor of the residence, and he eventually exited from a door leading out from the basement. *Id.* After arresting the defendant and searching the basement, police discovered small baggies, marijuana, digital scales, and cocaine. *Id.* at 6–7. All four individuals were indicted for various

possessory offenses; the defendant was tried and convicted. *Id.* at 7–12.

On appeal in this Court, we noted that the State advanced the theory that the defendant and Benson had joint and constructive possession of the contraband. *Id.* at 14. We reversed, holding that we were "left with nothing but speculation as to [the defendant's] knowledge or exercise of dominion or control over the [contraband] found in the Bullocks[es'] basement." *Id.* at 17. We noted that the defendant "did not have any ownership or possessory right in the premises where the drugs and paraphernalia were found[]" because the evidence established that the Bullockses rented out the basement to Benson—not the defendant. *Id.* at 18. While there were two lines of testimony that the defendant was living with the Bullockses, *id.* at 18 n.10, there otherwise was no evidence as to the length of time that defendant had stayed there, *id.* at 18. Thus, on that record, we could not conclude that the defendant had "any ownership or possessory right to or in the Bullocks[es'] home." *Id.* Nor could we say that the defendant was ever in proximity to the contraband in the basement. *Id.* Although the defendant eventually exited the home through a door leading to the basement, there was no evidence as to his whereabouts while he was inside the basement. *Id.* at 19–20. Lastly, we noted the dearth of evidence concerning whether the defendant was participating in the use and enjoyment of the contraband. *Id.* at 20. The circumstantial evidence in that case simply failed to establish that the defendant exercised the requisite knowledge and dominion or control over the contraband, thus, requiring reversal. *Id.* at 24.

In *Gutierrez*, we affirmed convictions of joint and constructive possession for drugs and firearms. 446 Md. at 241. There, two individuals, Gutierrez and Perez-Lazaro,

51

were living in a one-bedroom apartment with a second bed stationed in the living room; Gutierrez slept in the living room, while Perez-Lazaro slept in the bedroom. *Id.* at 224. Law enforcement searched that apartment and found, in common areas, bags for packaging drugs, cocaine, a grinder, and a firearm. *Id.* at 224–25. Both were charged accordingly. *Id.* at 225–26. In moving for judgment of acquittal, Gutierrez argued that, despite his statement that he slept in the living room and police having found two passports and a paper identifying him, there was no evidence connecting him to the drugs or the gun. *Id.* at 226. Perez-Lazaro similarly argued that the evidence showed only that he slept in the back bedroom and that police found a paystub with his name on it. *Id.* at 227. The circuit court denied both motions. *Id.*

On appeal in this Court, we were tasked with answering whether those convictions could stand "when neither actually had the gun or drugs in hand, but each was allegedly in constructive possession of the gun and cocaine." *Id.* at 231. Utilizing the four factors, we adopted in *Smith*, we held that they could. *Id.* at 236. As to the first two factors, we noted that both individuals were in close proximity to the drugs and that "the small size of the apartment and the location of the drugs in the hallway, bathroom[,] and kitchen rendered the drugs and gun available to both [defendants]." *Id.* at 237. Concerning the third factor, we held that, because the evidence indicated that the apartment was used as a base for a drug operation, we could infer that each derived use and enjoyment of the contraband. *Id.* at 237–38. Finally, as to the fourth factor, because there was evidence that both individuals slept at the apartment and kept their personal belongings there, both could be said to have a possessory interest in the apartment. *Id.* at 236–37.

52

Here, the agreed-upon statement of facts provided enough evidence for a rational factfinder to conclude beyond a reasonable doubt the essential elements of the crime, i.e., that Mr. Founds constructively possessed the contraband in Bedroom 2, as well as the body armor.

Beginning with the third factor, indicia of mutual use and enjoyment of the drugs, the Appellate Court concluded, consistent with what we said in *Gutierrez*, that "the quantity of drugs and character of the associated contraband support a rational inference that the [a]partment housed a drug-dealing enterprise indicative of the mutual use and enjoyment of all the contraband in [Mr. Founds' a]partment, including Bedroom 2." *Founds*, 2025 WL 2374199, at *10. Mr. Founds takes issue with the Appellate Court's statement, contending that we have "never endorsed the theory that evidence of a collective drug-dealing enterprise may on its own be sufficient to establish possession of contraband found in a location that the [State] has not otherwise established the defendant may access." Mr. Founds is correct, but that is not what the Appellate Court concluded. The Appellate Court merely held that—under the third factor—the facts of this case show that the entire apartment was used as a drug-dealing operation, and, as such, Mr. Founds can be said to have benefited from the mutual use and enjoyment of the contraband found therein. *Id.* at *9–10. In essence, the Appellate Court held that the third factor weighed in favor of concluding that a rational factfinder could reasonably infer that Mr. Founds exercised some dominion or control over the contraband in Bedroom 2. We agree.

Within Bedroom 1 and the common areas, police found the original FedEx package containing 13.266 pounds of marijuana, additional quantities of marijuana, more

53

than \$80,000 in cash, drug ledgers, scales, packaging materials, various firearms, ammunition, and the body armor. In Bedroom 2, law enforcement found additional marijuana and the psilocyn mushrooms. A rational factfinder could infer that Mr. Founds' apartment was serving as a drug-dealing enterprise and that he was engaged in that enterprise, deriving mutual use and enjoyment from all the contraband therein.[15] We note, however, that it will be incumbent on the State to prove whether the facts of a given case can lead a rational factfinder to conclude that the contraband seized constitutes a drug-related enterprise.[16]

---

[15] Mr. Founds makes much of the fact that the only charge relative to distribution was for the psilocyn mushrooms, which were located in Bedroom 2, and that the State did not charge Mr. Founds with any count related to distribution of marijuana. To assess the contents of Bedroom 2, in determining whether the entire apartment was a drug-dealing enterprise, when the contents in Bedroom 2 were the only items associated with a distribution charge is, in Mr. Founds' view "circular." But whether the State charged Mr. Founds with distributing just the psilocyn mushrooms, just marijuana, both, or neither, does not detract from the fact that a rational factfinder could reasonably find, based on the quintessential evidence of drug distribution uncovered, that Mr. Founds' apartment was a stash house and that he was engaged in a drug-dealing enterprise.

[16] Determining whether a location constitutes a drug-dealing enterprise will be a fact-driven analysis depending on the nature and quantity of the contraband discovered. So too for whether a factfinder can reasonably infer that an individual was involved in that enterprise. *See Moye*, 369 Md. at 17–18 (rejecting the State's argument that defendant had knowledge of or dominion and control over drugs and paraphernalia found in the basement of a house where defendant was staying with the owners, who were found to have possessed the drugs). We find it proper, in determining whether a rational factfinder could reasonably infer that an *entire location* is a drug-dealing enterprise, to omit the evidence over which there is a dispute because failure to do so risks sweeping in potentially innocent individuals. Once such an inference can be made, a factfinder is not required to close its eyes to certain contraband associated with that enterprise simply because it is located in a room over which a defendant claims not to have exclusive control. That is, of course, the entire point of the constructive possession analysis. Thus, even if we omitted the contraband from Bedroom 2, as Mr. Founds argues that we should, there was enough evidence—that Mr. Founds does not contest could be attributed to

Regarding the fourth factor, a rational factfinder also could reasonably infer that Mr. Founds had a possessory interest in Bedroom 2. The agreed-upon statement of facts noted that law enforcement independently located an address associated with Mr. Founds and received confirmation from the unit owner that Mr. Founds "liv[ed] in [the] apartment[,]" and Mr. Founds subsequently "open[ed] the apartment door[]" when law enforcement knocked. Thus, a rational factfinder could infer that Mr. Founds was renting the apartment as a tenant, which gave Mr. Founds a possessory interest in the apartment. *See Uthus v. Valley Mill Camp, Inc.*, 472 Md. 378, 401 (2021) ("[A] landlord-tenant relationship entitles the tenant to the right of possession to the exclusion of the landlord[] . . . ." (citing *Curtis v. U.S. Bank Nat'l Ass'n*, 427 Md. 526, 536 (2012))). A "possessory interest" is the "present right to control property, including the right to exclude others, by a person who is not necessarily the owner[;]" "[a] present or future right to the exclusive use and possession of property." *Possessory interest*, Black's Law Dictionary (12th ed.

---

him—for a rational factfinder to infer that Mr. Founds' apartment was being used as a drug-dealing enterprise. For example, assume that a two-bedroom apartment has two inhabitants, and officers find the same contraband, as in this case, solely in Bedroom 2. That evidence would still be enough for a rational factfinder to reasonably infer that *Bedroom 2* contained a drug-dealing enterprise. But that would beg the question of whether the entire apartment could be said to constitute a drug-dealing enterprise and, furthermore, whether the inhabitant of Bedroom 1 was engaged in that enterprise.

We also note that, even when a factfinder could reasonably infer that an entire location is a drug-dealing operation, i.e., that an *entire dwelling* is used for a drug-dealing enterprise, only contraband *associated with* that drug-dealing enterprise can be considered. For example, if the facts indicate that an entire two-bedroom apartment is a drug-dealing enterprise, then evidence of a crime—wholly unrelated to the drug-dealing enterprise—could not be swept into that enterprise. So, if Bedroom 2 contained evidence relating to the drug-dealing enterprise and evidence not so related, say, stolen computers, the State would be hard pressed to charge the occupant of Bedroom 1 with possession of the stolen computers simply because they may be said to constructively possess the paraphernalia constituting the drug-related enterprise.

55

2024). Based on the facts of this case, a rational factfinder could conclude that Mr. Founds had a possessory interest in the entirety of the apartment—not merely Bedroom 1 and the common areas.

Mr. Founds argues that the State did not introduce evidence that he "rented the apartment as a whole[]" and that the agreed-upon statement of facts simply states that he "was 'living' in the apartment[.]" The State certainly *could have* introduced more evidence to bolster its case, but it was not required to negate every possible explanation as to the status of Bedroom 2. In other words, the State was not *required* to introduce a lease showing Mr. Founds as the sole tenant of the apartment, photographic evidence that Mr. Founds utilized Bedroom 2, or other such evidence. The fact that law enforcement independently verified the address as associated with Mr. Founds and confirmed with the building owner that Mr. Founds rented the separate apartment, as well as Mr. Founds having eventually answered the door, certainly permits a rational factfinder to draw the reasonable inference that Mr. Founds had a possessory interest in the entire apartment. *See Maryland v. Pringle*, 540 U.S. 366, 373 (2003) ("[I]t was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.").

In any event, Mr. Founds' argument turns our case law on its head. As *Moye* and *Gutierrez* make clear, when it comes to the dominion and control analysis for constructive possession, the baseline is that—absent evidence *affirmatively* establishing an individual's living situation—we will not presume that the presence in a particular

56

location establishes that an individual resides there. *See Moye*, 369 Md. at 18 (noting that, despite evidence that the defendant was "living" at the house in question on the date drugs were discovered, "[n]o evidence was adduced at trial as to how long [the defendant] had been staying" at the home, so the Court could not "conclude that [the defendant] had any ownership or possessory right" in the home); *Gutierrez*, 446 Md. at 236–37 (noting that the defendants had a possessory interest in the apartment in question because both had informed the police that they slept there and because personal items belonging to them were found there). Mr. Founds inverts that standard and argues that, because the State did not affirmatively establish that the other individual discovered in his apartment *did not* live there, the State, and any factfinder, must assume that the other individual resided at Mr. Founds' apartment and occupied Bedroom 2. We reject a framework that silos the State into disproving a third party's possessory interest in an apartment that was plainly being used in its entirety to house a drug operation in order to conclusively prove a defendant's possessory interest. While the State certainly is free to introduce such evidence to bolster its case, it is not required to do so.

As to the second factor, whether the drugs were in plain view of and/or accessible to the defendant, we note that, by virtue of the fact that a rational factfinder could conclude that Mr. Founds had a possessory interest in the entire apartment as the sole renter of an apartment being used to house a drug operation, he had full access to the contraband in Bedroom 2.[17]

---

[17] Conversely, if a rational factfinder could not have concluded that Mr. Founds was the sole tenant, then the State certainly would have needed other evidence for this

Finally, as to the first factor, the defendant's proximity to the drugs, Mr. Founds argues that, because he was arrested outside of the apartment, he was not in proximity to the contraband in Bedroom 2. His argument myopically focuses on the precise moment of arrest at the expense of relevant information *prior to* his arrest. The agreed-upon statement of facts establishes that Mr. Founds was present at the apartment when law enforcement arrived—answering the door himself when officers knocked. A factfinder is not required to set aside what that fact plainly implies: Moments before the arrest, Mr. Founds was inside his apartment where the drugs, cash, firearms, and other drug trafficking materials were found. His stepping across the threshold of the apartment and closing the door when he answered it does not sever his proximity to the contraband, but rather establishes it. That inference is considerably stronger than the facts present in *Taylor*, where the defendant was a guest in a shared hotel room, and the drugs were concealed in another's personal belongings, *see* 346 Md. at 455–56, or in *Moye*, where the defendant's presence at the home belonging to others was ambiguous, but at best, transient, 369 Md. at 5. Here, by contrast, Mr. Founds answered the front door of his apartment where all the contraband was located. That is conclusive proximity to the entire unit housing the drug-dealing enterprise. *See Gutierrez*, 446 Md. at 237 ("[The defendants] also were in close proximity to the drugs. Unlike in *Moye* in which the house had a number of floors with the suggestion that Moye lived on the top floor while the drugs were in the basement, the small size of the apartment and the location of the drugs

---

factor to cut in favor of Mr. Founds having constructive possession, as individuals typically do not have access to the bedrooms of other tenants with whom they live.

58

in the hallway, bathroom and kitchen rendered the drugs and gun available to both [the defendants]").

Considering all four factors that we established in *Smith*, we hold that a rational factfinder could find beyond a reasonable doubt that Mr. Founds constructively possessed the contraband in Bedroom 2. In doing so, we do not adopt the State's sprawling drug-enterprise theory, which would essentially collapse our four factors into the single inquiry of whether a defendant was engaged in a drug-related enterprise. Rather, we reaffirm our holding in *Gutierrez* that the existence of a drug-related enterprise is evidence that a defendant shared in the mutual use and enjoyment of contraband, which is but one factor in the constructive possession analysis. *See* 446 Md. at 237–38. Nothing in this opinion should be interpreted as permitting the State to leverage the presence of a drug-related enterprise to any factor in the constructive possession analysis other than the third factor—mutual use and enjoyment.

Our holding also is consistent with our case law in which we have held that defendants both have and have not constructively possessed contraband. Relying on our opinion in *Taylor*, Mr. Founds argues that we "previously have rejected the proposition that mere association with illegal drugs is sufficient to establish that an individual had access to drugs in a location potentially inaccessible to him." The facts of *Taylor* could not be further from those in Mr. Founds' case. While the evidence in *Taylor* showed proximity to the drugs and a possessory interest in the hotel room in which they were eventually discovered, the drugs were otherwise not on the defendant's person, the drugs were attributable to other people, and the drugs were not accessible to him. 346 Md. at

459–60. Unlike the defendant in *Taylor*, firearms, ammunition, large amounts of cash, and drug distribution materials all can be attributed to Mr. Founds. And Mr. Founds does not contest that such contraband can give rise to the inference that he was engaged in a drug-related enterprise; rather, he contests that *certain drugs* are not part of that enterprise because he had no dominion or control over them. Critically, the evidence in Mr. Founds' case, as recounted above and unlike the facts in *Taylor*, permits a factfinder to make a reasonable inference that he had mutual use and enjoyment of the contraband in Bedroom 2 and ready access to that contraband. The facts of *Taylor* are, thus, far removed from anything we have here.

Mr. Founds proffers that *Gutierrez* strengthens his position because that case involved drugs found only in common areas as opposed to individual bedrooms. But that factual distinction in *Gutierrez* does not dictate a different outcome here. As we noted above, we do not adopt the State's overreaching drug-related enterprise theory whereby all four *Smith* factors for determining constructive possession weigh in the State's favor where the evidence permits a rational factfinder to infer that a drug-dealing enterprise is present. Rather, we have shown how properly assessing those four factors leads to the conclusion that a rational factfinder could have found beyond a reasonable doubt that Mr. Founds possessed the contraband in Bedroom 2. *If* the evidence showed that Mr. Founds' apartment had multiple inhabitants, *and if* all the contraband were located in the bedroom not occupied by Mr. Founds, *then Gutierrez* would be helpful to him because that case involved drugs found only in areas common to the two defendants who lived there. *See Gutierrez*, 446 Md. at 224–25. In that hypothetical, it would be much harder for the State

to (1) advance the theory that there was a drug-related enterprise, i.e., that Mr. Founds partook in the mutual use and enjoyment of the contraband, (2) show that Mr. Founds had access to the drugs, and (3) that he presumably was in close proximity to the drugs. The mere fact that *Gutierrez* did not involve contraband in the bedroom is not enough to require a different conclusion here.

Neither party addressed in any detail Mr. Founds' possession of the body armor. That arguably is because Mr. Founds' conviction for possession of body armor rises and falls with his conviction for the marijuana offense. In other words, if he is correct that he did not have constructive possession of the drugs in Bedroom 2, then the State's path to conviction for the body armor crumbles. Under CR § 4-106, a person may not possess bulletproof body armor during and in relation to a drug trafficking crime as defined by CR § 5-621. Section 5-621 defines "drug trafficking crime" as a felony or a conspiracy to commit a felony involving the possession of a controlled dangerous substance under, among other sections, CR § 5-602. Given the aforementioned analysis affirming Mr. Founds' conviction under CR § 5-602, his possession of bulletproof body armor during and in relation to that offense, therefore, was also unlawful.

Mr. Founds also appears to vaguely argue that, at most, the agreed-upon statement of facts simply mentioned that the body armor was in the apartment. Assuming that Mr. Founds argues that, because the body armor's location was somewhere "in the residence," we are required to assume that it was found in Bedroom 2, and, thus, not attributable to him, we hold that, under the same four-factor analysis for the possession of the additional marijuana and psilocyn mushrooms, a rational factfinder could find beyond

a reasonable doubt that Mr. Founds possessed the body armor. Applying the four factors, Mr. Founds answered the door and stepped out of the apartment, placing him inside the apartment moments before his arrest, proximate to the armor (first factor); because Mr. Founds had a possessory interest in the entire apartment as the sole tenant of an apartment being used in its entirety for a drug enterprise, the body armor being located somewhere within the walls, was accessible to him (second and fourth factors); and the presence of body armor within the apartment functioning as a stash house supports the inference that it was a tool of that enterprise, one from which Mr. Founds derived mutual use and enjoyment alongside the other contraband found (third factor). As all four factors point towards Mr. Founds having constructive possession of the body armor, we affirm his conviction for possessing bulletproof body armor during and in relation to a drug-trafficking crime.

## V
## CONCLUSION

We assume—without deciding—that law enforcement's protective sweep of Mr. Founds' apartment was unconstitutional. Nevertheless, we hold that the subsequently obtained warrant in this case served as an independent source for obtaining the contraband seized from Mr. Founds' apartment. This warrant was an independent source because, after excising information obtained from the initial illegal entry, the remaining information in the warrant establishes probable cause. We further hold that the agreed-upon statement of facts contained sufficient evidence for a rational factfinder to find beyond a reasonable doubt the essential elements of the crimes for which Mr. Founds was

convicted. We, therefore, affirm the judgment of the Appellate Court and Mr. Founds'

convictions.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. PETITIONER TO PAY COSTS IN THIS COURT.**

Circuit Court for Worcester County
Case No. C-23-CR-23-000016

Argued: March 10, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 48

September Term, 2025

_____

ANDREW CAMPBELL FOUNDS

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: August 7, 2026

Respectfully, I dissent.  There are two opinions authored by my colleagues, each offering a different test for determining whether evidence recovered pursuant to a search warrant is admissible under the independent source doctrine when the warrant affidavit contains both information obtained during a prior unlawful search and information that was not obtained from the prior search.  I join Justice Biran's opinion in its entirety because, in my view, it is the opinion that best gives effect to the requirements of the independent source doctrine set forth by the Supreme Court of the United States in Murray v. United States, 487 U.S. 533 (1988), and the principles underlying the exclusionary rule itself.

The case presents two issues concerning exceptions to the Fourth Amendment exclusionary rule: (1) whether exigent circumstances justified an officer's initial warrantless entry and search of Mr. Founds's residence; and (2) if not, whether a subsequent search pursuant to a warrant was an independent source of the evidence at issue.  The latter is an issue first impression and the former is an issue that we have not recently addressed.  I will forego a lengthy discussion of the facts as the background of the case is comprehensively set forth in the two other opinions.  I will explain why I agree with Justice Biran's resolution of both the issue of exigent circumstances and application of the independent source doctrine.

I agree with Justice Biran that the State failed to demonstrate that exigent circumstances justified the search of Mr. Founds's apartment.  I address this issue mainly to point out that the test for exigent circumstances is an objective one.  With respect to the entry into a person's home by police officers, the Supreme Court has held that warrants are generally required unless "'the exigencies of the situation' make the needs of law

enforcement so compelling that [the] warrantless search is objectively reasonable[.]" Kentucky v. King, 563 U.S. 452, 459-60 (2011) (citation modified). The test for exigent circumstances is objective. See id. at 460. It hinges on whether a reasonable police officer would believe there is an urgency, not on an officer's personal feelings or private thoughts. See id.

There are a variety of different types of circumstances that may constitute exigent circumstances. Concerns about officer safety and the prevention of the destruction of evidence are among a lengthy list of circumstances that courts have found constitute emergencies or exigent circumstances that justify the warrantless entry of a residence. See, e.g., id.; Brigham City v. Stuart, 547 U.S. 398, 403 (2006). Although the test for determining whether exigent circumstances exist is an objective one, an officer must identify an urgency for a court to determine whether the facts known to the officer at the time justified the warrantless entry. In other words, although an officer's subjective beliefs do not make an entry legal or illegal, the officer must identify the nature of the emergency in order for the court to objectively test the facts. In this case, the officers did not identify any emergency. According to the warrant affidavit, Corporal Converse placed Mr. Founds in investigative detention and "conducted a protective sweep of the apartment to secure it in preparation for a search warrant." And as Justice Biran points out: "In his argument at the suppression hearing, the prosecutor stated that it was reasonable for the officers to enter the apartment without a warrant 'to try to establish if they are at the right location and whether or not there's enough evidence for a crime[.]'" J. Biran Dissenting Slip Op. at 14 n.3. Given the lack of any emergency or urgent circumstances identified by the officers as

- 2 -

the reason for the warrantless entry, there is no basis on which to determine whether a reasonable officer would have believed that the circumstances constituted exigent ones.

Under the independent source doctrine, where police officers unlawfully enter a residence without a warrant, evidence later seized pursuant to a search warrant is not suppressed simply because of the officers' previous entry if the warrant was based on information wholly independent of the unlawful entry. See Segura v. United States, 468 U.S. 796, 815 (1984). In Murray, 487 U.S. at 542, the Supreme Court of the United States held that a search pursuant to a warrant is valid where the decision to seek the warrant was not prompted by what officers observed during the earlier entry and the magistrate's probable cause determination was not affected by tainted information. In Murray, id., the Supreme Court stated that "[t]he ultimate question [] is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here." The Supreme Court explained that "[t]his would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." Id. (footnote omitted).

In my view, an objective determination as to probable cause after excision of tainted information from a warrant affidavit is inconsistent with Justice Scalia's statement in Murray, id. at 542, that a court must determine whether information obtained during the unlawful entry "was presented to the Magistrate and affected his decision to issue the warrant." In United States v. Restrepo, 966 F.2d 964, 970 (5th Cir. 1992), however, the United States Court of Appeals for the Fifth Circuit held that, in Murray, the Supreme

- 3 -

Court did not intend to invalidate the approach in Franks v. Delaware, 438 U.S. 154 (1978), of redacting tainted information and affirming the validity of a warrant if the remaining information established probable cause. The Fifth Circuit stated that it found "no other post-*Murray* circuit cases concerning the independent source doctrine that have interpreted *Murray* as refuting their pre-*Murray* holdings that inclusion of illegally-acquired information on a warrant affidavit does not invalidate the warrant if the affidavit's other averments set forth probable cause." Restrepo, 966 F.2d at 970 (footnote omitted). The Fifth Circuit concluded that the district court erred in finding that Murray required suppression of evidence seized in a warrantless search "in the absence of subjective proof by the government that the tainted information did not affect the decision of this particular magistrate judge to issue the warrant." Id. According to the Fifth Circuit, "[i]nstead, in all such cases the district court should consider whether the warrant affidavit, once purged of tainted facts and conclusions, contains sufficient evidence to constitute probable cause for issuance of the warrant." Id. Other federal appellate courts have reached the same conclusion. See, e.g., United States v. Jenkins, 396 F.3d 751, 757-60 (6th Cir. 2005); United States v. Swope, 542 F.3d 609, 614, 616-17 (8th Cir. 2008).

The majority opinion meticulously sets forth the approach taken by the federal appellate courts that have reviewed the issue. Unfortunately, I cannot join the opinion because I do not agree that excising tainted information from a warrant affidavit and then determining objectively whether the remaining information establishes probable cause is the right approach for ascertaining whether a warrant is genuinely an independent source of evidence, *i.e.*, whether a judge's decision to issue a warrant was influenced by tainted

- 4 -

information in the warrant affidavit.  I realize that the objective excision approach is the method that federal appellate courts that have reviewed the issue have taken.  But, this Court is not bound by the decisions of federal appellate courts that interpret the holdings of the United States Supreme Court.  Although we may be guided by federal appellate court decisions, we are bound by the decisions of the United States Supreme Court and must perform our own analysis of how to give effect to those decisions.

In my view, the majority opinion, while accurate about the approach the federal courts have taken, fails to recognize that the objective excision test does not give effect to the Supreme Court's clear edict in Murray, 487 U.S. at 542, that for the independent source doctrine to apply, a court must determine whether information obtained during the unlawful entry "was presented to the Magistrate and affected his decision to issue the warrant." Because the majority opinion does not respond to arguments made by Mr. Founds but instead attempts to rebut the test recommended by Justice Biran, I will address the majority's criticisms of the dissent.

First, the majority opinion states that, prior to Murray, "federal circuit courts had been applying an objective *Franks* excision approach to analyze whether a search warrant that included tainted information affected the issuing judge's decision to issue a warrant. *See Restrepo*, 966 F.2d at 969 n.10; [*United States v.*] *Dessesaure*, 429 F.3d [359,] 366 [(1st Cir. 2005).]" Maj. Slip Op. at 33.  That federal courts had been applying an objective excision, *i.e.*, Franks method, to remove tainted material from search warrant affidavits before the United States Supreme Court's decision in Murray demonstrates that the objective approach was not an approach adopted by federal courts' exclusively as a result

- 5 -

of their interpretation of <u>Murray</u>.  Rather, even though <u>Murray</u> does not mention use of an objective approach, federal courts interpreted <u>Murray</u>'s holding to be consistent with their existing <u>Franks</u> approach.

The majority opinion cites two federal cases for the proposition that federal courts had employed the <u>Franks</u> approach before <u>Murray</u>—<u>Restrepo</u> and <u>Dessesaure</u>.  <u>See</u> Maj. Slip Op. at 33.  In <u>Restrepo</u>, 966 F.2d at 969, the Fifth Circuit stated: "Prior to *Murray,* this and other circuits had adopted variations on the rule that evidence obtained in an illegal search is first excised from the warrant affidavit, after which the expurgated version is evaluated for probable cause."  (Footnote omitted).  The Fifth Circuit cited two cases in support of the objective approach—<u>United States v. Antone</u>, 753 F.2d 1301 (5th Cir. 1985), and <u>United States v. Veillette</u>, 778 F.2d 899 (1st Cir. 1985)—and stated that "[t]his approach was simply the logical extension of the rule in *Franks* that warrant affidavits containing *false statements* are to be afforded this treatment."  <u>Restrepo</u>, 966 F.2d at 969 & n.10.  In <u>Restrepo, id.</u> at 969-70, the Fifth Circuit explained that, in <u>Antone</u>, the defendant moved to suppress evidence seized pursuant to a search warrant on the ground that the warrant affidavit included information gained through a prior illegal search, the trial court denied the motion, and on review it determined that the trial court "acted correctly in excising the tainted information from the warrant affidavit and then considering whether the redacted warrant was nevertheless based on probable cause" and concluded "that because the tainted information constituted only a small part of the information presented

to the magistrate judge in support of the search warrant, the warrant was based on probable cause." (Footnote omitted).[1]

In Veillette, 778 F.2d at 902-04, the trial court suppressed certain evidence—marijuana concealed by a truck bed—and the First Circuit concluded that "excluding the already suppressed evidence found on the premises, the affidavit squarely rests on evidence obtained prior to the illegal entry[,]" and in its view, the evidence "was more than adequate in itself to establish probable cause for issuance of a search warrant." After discussing Franks, the First Circuit stated:

> Knowingly including a false statement in a warrant affidavit seems the functional equivalent of (if not an even more serious transgression than) including in the affidavit knowledge of facts illegally obtained. Logically, then, the bales of marihuana that were improperly included in the warrant affidavit here should be dealt with in a similar fashion, i.e., they should be set to one side (as the district court did) and the remaining content of the affidavit examined to determine whether there was probable cause to search, apart from the tainted averments.

Id. at 904. The First Circuit acknowledged that the tainted evidence was included in the warrant affidavit and reached the magistrate, but following the Franks approach, it affirmed the trial court's refusal to suppress all of the evidence obtained pursuant to the search warrant. See id.[2]

---

[1]In Antone, 753 F.2d at 1307, the Fifth Circuit does not mention the independent source doctrine at all; the Court just relied on Franks.

[2]In Veillette, 778 F.2d at 903-04, the First Circuit mentions the independent source doctrine only two times. First, the concept of the warrant as independent source is mentioned in a block quote discussing the Segura case:

> [T]he evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on

In <u>Dessesaure</u>, 429 F.3d at 361, 365, there were material misrepresentations in the warrant affidavit that triggered the <u>Franks</u> approach and "tainted" information. The United States Court of Appeals for the First Circuit stated:

> [T]he district court suppressed evidence seized from Earl Dessesaure's apartment (consisting of heroin, drug paraphernalia, a gun, and bullets) pursuant to a warrant because the warrant affidavit contained information that the police observed when they earlier illegally entered the apartment to "freeze" it and because of **material misstatements** in that affidavit. Accepting as accurate these factual conclusions, we nonetheless disagree with the trial court's ultimate conclusion that suppression was required.

> information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

<u>Veillette</u>, 778 F.2d at 903 (citation modified).

And, the doctrine is mentioned in a parenthetical following a quote taken out of context from the <u>Nix</u> case:

> To be sure, unlike the situation in *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) and our own recent case of *United States v. Moscatiello*, 771 F.2d 589 (1st Cir.1985), the tainted evidence here was included in the warrant affidavit and thus reached the magistrate. However, the approach we follow, taken from *Franks*, is squarely within the Supreme Court's recent admonition that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position than they would have been if no police error or misconduct had occurred." *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (discussing independent source doctrine) (emphasis in original). We therefore affirm the district court's refusal to suppress all of the evidence obtained pursuant to the search warrant for the Shoppe.

<u>Veillette</u>, 778 F.2d at 904. Like the majority opinion, the First Circuit misinterprets the <u>Nix</u> case and implies that, even where an uncured Fourth Amendment violation has occurred, there is a societal interest in police officers not being put in a worse position than they would have if no error had occurred.

Rather, we find that, even after striking the offending material from the warrant, there was adequate basis for a probable cause determination and the officers would have sought a warrant regardless.

Id. at 361 (emphasis added). In Dessesaure, 429 F.3d at 365, the First Circuit explained:

The district court's analysis, as it correctly articulated, was governed by *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Under the procedure set forth in *Franks*, a court faced with a warrant affidavit which includes deliberately or reckless false statements must set aside those false statements and determine whether the remaining information in the affidavit sets forth sufficient facts to support a finding of probable cause. *Franks*, 438 U.S. at 171-72, 98 S.Ct. 2674.

In Dessesaure, the only appropriate method to address the material misrepresentations in the warrant affidavit was for the First Circuit to deploy the Franks objective excision test. Restrepo and Dessesaure demonstrate that the practice of excising tainted information from a warrant affidavit and determining whether the remaining information is an independent source of the evidence is not a practice that federal courts developed based solely on an interpretation of the Supreme Court's decision in Murray. Instead, federal courts relied heavily on the circumstance that this was an existing practice and interpreted Murray in a manner that permitted them to continue what they already had been doing.

Second, the majority opinion states that "there was no reason for the *Murray* Court to comment upon *Franks* or an excision analysis because the warrant in question did not contain any tainted information." Maj. Slip Op. at 34. What the majority opinion overlooks is that, in Murray, it is precisely because the warrant affidavit itself did not contain any tainted information that the Supreme Court of the United States concluded the

- 9 -

magistrate's decision to issue the warrant was not affected by tainted information[3] and remanded the case for the District Court to make findings as to the first prong of the test. In Murray, because it is clear that the affidavit contained no tainted information, the only purpose for the Supreme Court's inclusion of the second prong of its test would have been to account for the possibility that there may well be cases in the future in which a warrant affidavit would contain both tainted and untainted information.[4] This demonstrates that, where an affidavit contains both tainted and untainted information, excising tainted information from the affidavit and having another judge objectively determine probable cause is not the standard that the United States Supreme Court contemplated in setting forth the requirement that the State must demonstrate that the issuing judge/magistrate was not affected by tainted information in a warrant affidavit.

Third, the majority opinion states that "the Principal Dissent's assertion that an objective analysis 'creates affirmative incentives for law enforcement to engage in unreasonable searches and seizures' is overstated." Maj. Slip Op. at 35 (citation modified). In support of this conclusion, the majority opinion states only that an objective analysis has been used in the Franks context for decades and "[t]here is no evidence that the objective excision analysis has led to a rise in unlawful law enforcement searches." Maj. Slip Op. at

---

[3]The Supreme Court determined that "[t]he District Court found that the agents did not reveal their warrantless entry to the Magistrate, and that they did not include in their application for a warrant any recitation of their observations in the warehouse[.]" Murray, 487 U.S. at 543 (citation modified).

[4]In Murray, there was no indication that the magistrate had been exposed to tainted information outside of the four corners of the warrant, which could potentially have been another reason for the Supreme Court's inclusion of the second prong of its test.

35. This is an inappropriate comparison. When the <u>Franks</u> approach is deployed, an officer has made a false statement in a warrant affidavit. To be successful with a <u>Franks</u> challenge, a defendant must demonstrate that a particular officer has knowingly made a false statement in a warrant affidavit.

Under the <u>Franks</u> approach, it is not the objective determination that probable cause exists after the false information is removed from an affidavit that does or does not serve as a deterrent. Under <u>Franks</u>, the subjective proof of police misconduct, lying in a warrant affidavit, is its own deterrence. It would be unlikely that an officer who had been found by a United States District Court to have made a false statement in a warrant affidavit would not face severe career repercussions or, at a minimum, be deterred from further misconduct by the public pronouncement of dishonest behavior. This is why the <u>Franks</u> approach has not led to a rise in unlawful enforcement searches.

As Justice Biran correctly concludes, incorporating an objective excision analysis within the independent source doctrine will create an affirmative incentive for police officers to include tainted information in warrant affidavits because, unlike in a <u>Franks</u> case, there will be no consequence to an officer for having done so. The majority opinion has not rebutted this significant consequence of adopting the objective approach for use under the second prong of the <u>Murray</u> test.

Fourth, the majority opinion states that Justice Biran's dissent places too much emphasis on a segment of <u>Murray</u> in which Justice Scalia rejected Mr. Murray's argument. <u>See</u> Maj. Slip Op. at 35. In <u>Murray</u>, 487 U.S. at 540, among other things, Justice Scalia stated that an officer including tainted information in a warrant affidavit "would add to the

- 11 -

normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." Justice Scalia's statement speaks for itself. I will not dwell on this. It should be plain to anyone who reads the passage that Justice Biran has not taken the statement out of context.

Finally, the majority opinion states that "the Principal Dissent's test is too narrow and would place law enforcement officers in a much different and *worse* position than they would be if they had not undertaken the unlawful search in the first instance." Maj. Slip Op. at 36. In my view, with this contention, the majority opinion misinterprets case law explaining the rationale underlying the independent source doctrine and unfairly criticizes Justice Biran's opinion. According to the majority opinion, the rationale behind <u>Murray</u> and related cases is "that police who carry out a search that they should not have carried out should be put in the same, *but no worse*, position than they would have been absent any error or misconduct." Maj. Slip Op. at 29, 39 (citation omitted). In other words, according to the Majority, the rationale underlying the independent source doctrine is that police officers should not be placed in a worse position then if they had not engaged in an unlawful search. To be clear, as Justice Biran correctly explains, this is not the rationale underlying the independent source doctrine or the exclusionary rule. <u>See</u> J. Biran Dissenting Slip Op. at 19-20.

In <u>Nix v. Williams</u>, 467 U.S. 431, 443 (1984), although holding that the independent source doctrine did not apply to the circumstances of the case, the United States Supreme Court explained:

> The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. That doctrine, although closely related to the inevitable discovery doctrine, does not apply here . . . . The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. **When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.**

(Citation modified). In <u>Murray</u>, 487 U.S. at 542, the United States Supreme Court concluded that if a warrant is genuinely an independent source of evidence, then police officers should not be placed in a worse position. The goal of the independent source doctrine and the rationale underlying it is to determine whether the warrant is in fact an independent source. The policy is not that officers should not be placed in a worse position regardless of their conduct.[5] In fact, the principle underlying the exclusionary rule is that,

---

[5]On this point, the majority opinion makes conflicting statements. Despite relying heavily on federal cases that misinterpret the "worse off" language in <u>Nix</u>, the majority opinion states:

> To be clear, we do not read *Murray* to suggest that law enforcement should *never* be put in a worse position for conducting an unlawful search by excluding the evidence. Rather, the point *Murray* makes is that *where there is an independent source*, law enforcement should not be placed in a worse position due to the unlawful search than they would have been based upon the independent source.

- 13 -

where officers have engaged in unreasonable search, and there is no applicable exception to the warrant requirement, they must be placed in a worse position, *i.e.*, the evidence must be excluded. In setting forth the independent source doctrine, the United States Supreme Court expressed that policy by stating that, if a warrant is a genuine independent source of evidence, the officers should not be placed in a worse position. See Murray, 487 U.S. at 537. Neither the United States Supreme Court nor the federal appellate courts have held that a court should devise a test that seeks not to put an officer in a worse position after an officer has committed a violation of the Fourth Amendment.

Aside from the majority opinion's unfounded criticisms of the dissent, it is worth noting that the majority opinion seemingly views the inevitable discovery exception and the independent source doctrine as mutually exclusive principles. Comparing the two principles, the majority opinion states: "The inevitable discovery doctrine applies when evidence *would* have been discovered through lawful means even though it initially was discovered through a Fourth Amendment violation." Maj. Slip Op. at 12 (citation omitted). The fact that evidence was actually discovered pursuant to a warrant after police officers unlawfully searched a residence does not preclude application of the inevitable

Maj. Slip Op. at 37 n.9.

But, without disavowing its reliance on the federal cases, the Majority says that "[i]n [its] view, the issue is how to determine whether the source was independent—by excision, or by the Principal Dissent's relevance test" and that it "believe[s] that the excision method is most consistent with *Murray*'s rationale." Maj. Slip Op. at 37 n.9. This contradiction is important because it shows that the Majority understands that federal courts have misinterpreted the "no worse off" language in Nix, but, to support its holding, is nonetheless willing to rely on federal cases that have taken out of context language from Nix.

- 14 -

discovery exception.  See, e.g., Williams v. State, 372 Md. 386, 426, 813 A.2d 231, 255 (2002).[6]

To invoke the inevitable discovery exception to the exclusionary rule, the State is required, at a minimum, to affirmatively meet a two-part test.  The test is that "[t]he prosecution must establish, first, that certain proper and predictable investigatory procedures would have been utilized in the case at bar, and second, that those procedures would have inevitably resulted in the discovery of the evidence in question."  Stokes v. State, 289 Md. 155, 163, 423 A.2d 552, 556 (1980) (citation modified).  In Williams, 372 Md. at 423, 813 A.2d at 253, we stated: "That the police actually secured a search warrant addresses only one part of the inevitable discovery equation.  The State must also demonstrate that the evidence *inevitably would have been* found." (Citing Stokes, 289 Md. at 163, 423 A.2d at 556; United States v. Ford, 22 F.3d 374, 377-78 (1st Cir. 1994)).  To satisfy the inevitable discovery exception, the State must prove by a preponderance of the evidence, *i.e.*, that it is more likely than not, that the evidence would have been recovered by lawful police conduct.  See Williams, 372 Md. at 417, 428, 813 A.2d at 250, 256.  The

_____

[6]In Williams, 372 Md. at 395, 813 A.2d at 236, a Maryland State Police Trooper applied for a search and seizure warrant for rooms at a motel in Allegany County, Maryland.  The officer had just arrested an individual for distribution of controlled dangerous substances from a motor vehicle.  See id. at 395, 813 A.2d at 236.  Based on information from that person that he was staying at the motel, the trooper drafted an application for a search warrant.  See id. at 395, 813 A.2d at 236.  While he was doing so, and until he could secure the search warrant, other officers went to the motel and arrested Mr. Williams and searched the motel rooms.  See id. at 395, 813 A.2d at 236-37.  We held that the inevitable discovery exception did not apply because it had not been established that Mr. Williams inevitably would have been in the hotel room when the warrant was executed.  See id. at 426, 813 A.2d at 255.

- 15 -

circumstance that the evidence is actually recovered pursuant to a warrant does not preclude application of the fact-finding process necessary to satisfy the inevitable discovery exception. Here, nothing would have prevented the State from pursuing admission of the evidence under the inevitable discovery exception to the warrant requirement, under which the trial court would have been properly tasked with determining whether, regardless of the unlawful entry, the evidence would been recovered lawfully pursuant to a search warrant.

In this case, the test that Justice Biran recommends is the standard that is most faithful to the United States Supreme Court's discussion in Murray of the second prong of the test to determine whether a warrant is "a genuinely independent source" of evidence. See Murray, 487 U.S. at 542. Although, in Murray, the Supreme Court was not faced with a warrant affidavit containing both tainted and untainted information, the Court set forth a test requiring in its second prong that courts determine whether a judge's decision to issue a warrant was affected by tainted material in a warrant affidavit. The question and answer are straightforward—if the judge's decision to issue a warrant was affected by tainted information in the affidavit, then the affidavit is not a genuinely independent source of the evidence. In my view, it would not be logical to conclude that the Supreme Court intended courts to adopt a less stringent objective approach for determining whether a judge's decision to issue a warrant was affected by tainted information in an affidavit where it is clear that an affidavit does, in fact, contain tainted information. That the Supreme Court took the measure of setting forth a subjective approach in the second prong of the test in Murray, where there was no tainted information included in the warrant affidavit and no

- 16 -

apparent indication that the magistrate had otherwise been exposed to such information, demonstrates that the Supreme Court expected that the approach it directed would exceed the circumstances of the case.

On another matter, I disagree with Majority's conclusion that Mr. Founds did not pursue or failed to preserve an argument with respect to the first prong of the Murray test. See Maj. Slip Op. at 22. In his brief in this Court, Mr. Founds contends:

> *Murray* held that in addition to evaluating the effect of the unlawful search on the magistrate, a court considering whether to apply the independent source doctrine must ask whether "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry." 487 U.S. at 542. Courts widely hold that this requires a subjective analysis, i.e., whether the police actually "planned to get a warrant prior to" the unlawful entry. *Kamara* [*v. State*], 205 Md. App. [607,] 628[, 45 A.3d 948, 960 (2012)]. As one court explained, "[i]t is not sufficient, under *Murray*, for a court of appeals to infer from the circumstances that the police inevitably would have sought a warrant." *United States v. Leveringston*, 397 F.3d 1112, 1115 (8th Cir. 2005). Rather, the government "should present specific evidence that the officers were not prompted by allegedly unlawful activity to obtain the warrant, and should seek a finding on that point from the district court." *Id.*; *see also United States v. Siciliano*, 578 F.3d 61, 69 (1st Cir. 2009) ("the ultimate determination of the officers' intent is a subjective one").[7]

In its brief, the State did not contend that Mr. Founds failed to preserve an argument with respect to the need for the suppression court to make a finding concerning whether the officers' decision to seek the warrant was prompted by what they saw in his apartment. In Murray, 487 U.S. at 543, the Supreme Court vacated the judgment of the United States

---

[7]In his brief, Mr. Founds states that "this Court should at a minimum vacate [his] convictions and remand to the trial court to determine whether the tainted evidence in the warrant application affected the magistrate's decision."

Court of Appeals for the First Circuit, which had affirmed the defendants' convictions, and remanded the cases, explaining:

> To be sure, the District Court did determine that the purpose of the warrantless entry was in part "to guard against the destruction of possibly critical evidence," and one could perhaps infer from this that the agents who made the entry already planned to obtain that "critical evidence" through a warrant-authorized search. That inference is not, however, clear enough to justify the conclusion that the District Court's findings amounted to a determination of independent source.

(Citation modified).

Here, although Detective Converse stated in the search warrant affidavit that a protective sweep of Mr. Founds's apartment was conducted in anticipation of obtaining a warrant, this does not satisfy the requirement that the suppression court make factual findings as to whether the officers were prompted to obtain the warrant because of what they saw in the apartment. In my view, because the State has failed to demonstrate that tainted information in the warrant affidavit did not affect the issuing judge's decision as to probable cause, Mr. Founds's conviction should be reversed on that ground alone. However, given that the Majority has concluded that the second prong of the Murray test is satisfied and the record reflects that the circuit court made no findings with respect to the first prong, the Majority should decide the exigent circumstances issue and, if it agrees that no exception to the warrant requirement applies, reverse the judgment of the Appellate Court and remand the case to that Court with instruction to remand to the circuit court for a determination of independent source under the first prong of the Murray test.

For the above reasons, respectfully, I dissent.

Circuit Court for Worcester County
Case No.: C-23-CR-23-000016
Argued: March 10, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 48

September Term, 2025

_____

ANDREW CAMPBELL FOUNDS

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Dissenting Opinion by Biran, J.,
which Watts and Gould, JJ., join.

_____

Filed: August 7, 2026

The purpose of the exclusionary rule is to deter police misconduct. The rule "compel[s] respect for the constitutional guaranty in the only effectively available way – by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960). "As with any remedial device, the application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348 (1974). The Supreme Court of the United States has recognized three exceptions to the exclusionary rule where there is either no causal relationship between the unconstitutional act and the discovery of evidence or the relationship is so weak that applying the rule would not serve its deterrent purpose. The exception that concerns us here is the independent source doctrine, which "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Utah v. Strieff*, 579 U.S. 232, 238 (2016).

The Majority concludes that a warrant supported by observations made during a prior illegal entry may constitute an independent source under *Murray v. United States*, 487 U.S. 533, 537-38 (1988), so long as a redacted version of the warrant application – stripped of the tainted information – is later found by a suppression or appellate court to establish probable cause. In so doing, the Majority largely relies on federal appellate decisions that have imported the excision analysis set forth in *Franks v. Delaware*, 438 U.S. 154 (1978), to a context where it does not belong. In addition, the Majority suggests that de novo review by the suppression and appellate courts neutralizes any risk that the issuing judge's decision to sign the warrant may have been tainted by the illegally obtained information in the warrant application.

The Majority's approach "provide[s] government agents with an affirmative incentive to engage in unconstitutional violations of the privacy of the home." *Segura v. United States*, 468 U.S. 796, 817 (1984) (Stevens, J., dissenting). Because the Majority's decision is incompatible with the purpose of the exclusionary rule, I respectfully dissent.[1]

# I

## Background

## A

The following information was included in an officer's application and supporting affidavit to a judge of the District Court of Maryland for a warrant to search Petitioner Andrew Founds's apartment in Worcester County, Maryland.

On December 1, 2022, the Wicomico County Sheriff's Office received information about a suspicious parcel at a FedEx distribution hub. An officer seized the parcel, a "medium sized cardboard box." Upon examination, the officer identified the contents as "seventeen (17) individual heat-sealed packages of marijuana THC ranging in weights from 180.73 grams to 554.17 grams[.]" The intended recipient of the package was in Worcester County, Maryland. The Worcester County Sheriff's Office Criminal Enforcement Team ("CET") was notified of the parcel and its contents. CET officers subsequently repackaged the contents and delivered the parcel to the listed shipping address, leaving it on the front porch of the residence at that address. Surveilling CET officers later observed a white male retrieve the parcel and drive away in a Kia automobile.

---

[1] Given my conclusion that the circuit court erred in denying Mr. Founds's motion to suppress, I do not address the sufficiency of the evidence in support of his convictions.

The Kia was registered to Mr. Founds. The officers followed the Kia, but lost sight of it. The Sheriff's Office provided the CET officers with an address associated with Mr. Founds; the officers then drove to that location, where they observed the same Kia parked in front of the garage.

CET officers knocked on the door of Mr. Founds's apartment, and after "an extended period of time," Mr. Founds opened the door. Corporal Zachary Converse "immediately detected … the overwhelming odor of raw marijuana THC … emanating from the residence." He also observed Mr. Founds to be "overly nervous" and "trembling and covered in sweat" even though it was a cold December day. When Corporal Converse "attempted to speak to [Mr.] Founds about illegal controlled dangerous substances that are in his residence[,]" Mr. Founds "became uncooperative and refused to talk to [Corporal] Converse." Corporal Converse "placed [Mr.] Founds into investigative detention and investigators immediately conducted a protective sweep of the apartment to secure it in preparation for a search warrant."

During the "protective sweep," the officers located and detained a second man, later identified as John Paul Ternahan. While detaining Mr. Ternahan, officers observed numerous individual heat-sealed bags containing marijuana in plain view that appeared to be in approximately one-pound increments and consistent with the heat-sealed bags investigators had seen in the package at the FedEx facility. Corporal Converse also "observed a large brown box that [was] consistent with the original package in plain view located in a bedroom sitting on a bed."

3

The warrant application asserted that officers had reason to believe that, within Mr. Founds's apartment, "[t]here is now being concealed certain property, namely: controlled dangerous substances, controlled dangerous substance paraphernalia, records and monies from controlled dangerous substance transactions, recording equipment, cellular telephones, electronically recorded tapes, computers, documents, paperwork, firearms, ammunition and additional evidence related to controlled dangerous substance offenses." The application requested authority to search Mr. Founds's apartment and to seize the "aforesaid property and any other property found otherwise to be subject to seizure under the laws of the State of Maryland."

Lastly, the affidavit recited that "probable cause does exist to believe" that evidence of drug and firearms offenses would be found in the premises, based upon:

- Discovery of the 17 heat sealed packages of marijuana weighing 8,900.95 grams discovered by FEDEX employees
- The information provided by Wicomico County Sheriff's Office
- The controlled delivery by an Undercover Police Officer
- The investigation of Your Affiant and members of CET
- Surveillance conducted by Investigators
- *Observations made by [Corporal] Converse*
- Founds['s] criminal history
- The training, knowledge, and experience of Your Affiant.

(Emphasis added).

A District Court judge issued the warrant on December 1, 2022, and law enforcement officers executed it that evening. The officers seized a total of 52.364 pounds of marijuana, including 13.2666 pounds of marijuana in 14 heat-sealed packages from the original FedEx parcel. The officers also seized approximately 2.5 pounds of psilocybin

4

mushrooms, firearms and ammunition, a bulletproof vest, digital scales, cash, and drug ledgers.

## B

The State subsequently charged Mr. Founds in a 10-count indictment alleging drug, firearms, and other offenses stemming from the seizure of contraband from his apartment. Mr. Founds filed a motion to suppress the evidence seized by the officers upon execution of the search warrant. Given the reference to a "protective sweep" in the warrant affidavit, defense counsel cited this Court's leading case on protective sweeps, *Buie v. State*, 320 Md. 696 (1990). In *Buie*, on remand from the United States Supreme Court, this Court explained that a "protective sweep" is "a quick and limited search of a [sic] premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.* at 698 (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). "Such a search … is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* (internal quotation marks and citation omitted). Mr. Founds argued that, under *Buie*, the protective sweep of his apartment violated the Fourth Amendment because the officers had not placed him under arrest and lacked reasonable articulable suspicion that armed confederates of Mr. Founds were in the apartment.

The State called Corporal Converse as a witness at the suppression hearing. Among other things, Corporal Converse testified that, after placing Mr. Founds in handcuffs outside the entrance to his apartment, he asked Mr. Founds "if there was anybody else inside the residence or any guns." According to Corporal Converse, Mr. Founds "was very hesitant to answer [him]. However, he did finally advise that there was another person

5

inside the residence." The prosecutor then asked Corporal Converse: "Knowing there was somebody else in the apartment, what did you do after that?" Corporal Converse answered: "I gathered some other officers that were on scene and we conducted a protective sweep of the residence for other individuals."

Opposing the suppression motion, the prosecutor argued:

Mr. Founds obviously is de facto arrested. He's in handcuffs, he's not free to go, but he's not arrested for any crime at that point in time. And the reason I say that is because they don't have the physical evidence that he had the parcel or anything else at that point. They don't know based upon their interaction with him at that point in time before going into the residence whether he does in fact have the parcel or this, that and the other.

….

[Defense counsel] quotes Buie, Your Honor, which talks about a person who has been arrested for a specific crime and then goes into -- even though there's not a bright line rule, he numerically puts out what the factors are. And that just doesn't necessarily apply here because Mr. Founds is being detained and *they're going in to try to establish if they are at the right location and whether or not there's enough evidence for a crime.*

I think they clearly believe that there's going to be based upon the investigation, how it started. But I think it's responsible for the officers to do a protective sweep based upon the location, circumstances of the case, and then obviously since there was another individual within the residence. That's what I would say about the protective sweep.

(Emphasis added).

The prosecutor further argued that if the "protective sweep" violated the Fourth Amendment, the inevitable discovery exception to the exclusionary rule would apply, so the evidence discovered in the apartment should not be suppressed.

The circuit court initially ruled that the officers created the exigency to enter Mr. Founds's apartment without a warrant, which the court viewed as a Fourth Amendment

6

violation. Although the prosecutor invoked only the inevitable discovery doctrine, the court applied the independent source exception to exclusionary rule, excised the "objectionable portions from the search warrant,"[2] and determined that a sufficient basis remained for the issuing judge to find probable cause. Accordingly, the court denied Mr. Founds's motion to suppress.

Mr. Founds filed a motion for reconsideration. After reconsideration, the circuit court concluded that it "was erroneous in previously finding that law enforcement unlawfully created exigent circumstances[.]" The court clarified that, although the officers created the exigent circumstances justifying their warrantless entry of the apartment, "they did not do so by violating, or threatening to violate the Fourth Amendment[.]" Therefore, the court concluded, the initial warrantless entry did not violate the Fourth Amendment. The court thus affirmed its original ruling denying Mr. Founds's suppression motion, but on different grounds.

Mr. Founds subsequently pled not guilty to three of the charged offenses, based on an agreed statement of facts. The circuit court found Mr. Founds guilty of: (1) possession of marijuana over 50 pounds; (2) possession with intent to distribute psychedelic mushrooms; and (3) possession of a bulletproof vest in connection with a drug trafficking crime.

---

[2] Mr. Founds argued that the tainted information contained in the affidavit in support of the warrant was Corporal Converse's observation of "numerous individual heat sealed bags containing marijuana THC that appeared to be in approximate one-pound increments and were consistent with the heat sealed bags investigators had seen per the original [FedEx] package," as well as "a large brown box that was consistent with the original [FedEx] package."

On appeal, the Appellate Court of Maryland agreed with the circuit court on reconsideration that exigent circumstances justified the initial warrantless entry of Mr. Founds's apartment. *Founds v. State*, No. 2266, Sept. Term, 2023, 2025 WL 2374199, at *6 (Md. App. Ct. Aug. 15, 2025). Alternatively, relying on this Court's decision in *Williams v. State*, 372 Md. 386, 419 (2002), the Appellate Court affirmed the suppression court's initial ruling that, after excising Corporal Converse's observations during the "protective sweep" from the warrant affidavit, the issuing judge had a substantial basis to find probable cause to search Mr. Founds's apartment. *See Founds*, 2025 WL 2374199, at *7.

## II

## The Independent Source Doctrine

The Fourth Amendment of the U.S. Constitution, applicable to the States via the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. art. I, amend. IV. "When evidence is obtained in violation of the Fourth Amendment, it will ordinarily be inadmissible in a state criminal prosecution pursuant to the exclusionary rule." *Thornton v. State*, 465 Md. 122, 140 (2019). "In certain instances, however, an exception to the exclusionary rule may permit the admission of the evidence that was obtained in violation of the Fourth Amendment." *Id.*

8

The U.S. Supreme Court first announced the exclusionary rule in *Weeks v. United States*, holding that no documents discovered during a search that violated the Fourth Amendment could be retained or used against the defendant. 232 U.S. 383, 398-99 (1914). The Court reasoned that, otherwise, the Fourth Amendment's protection against unreasonable searches and seizures would be an empty promise and "might as well be stricken from the Constitution." *Id.* at 393.

The exclusionary rule safeguards Fourth Amendment rights primarily through deterrence: by prohibiting the use of evidence obtained through unconstitutional means, it eliminates the incentive for law enforcement to engage in unreasonable searches and seizures. *See Davis v. United States*, 564 U.S. 229, 236-37 (2011). Because the constitutionality of a search and seizure is distinct from the probative value of the seized evidence, the exclusionary rule exacts a cost to the factfinding process: if the evidence is suppressed, the trier of fact is denied the opportunity to consider probative evidence. *See Mapp v. Ohio*, 367 U.S. 643, 659 (1961) ("There are those who say, as did Justice (then Judge) Cardozo, that under our constitutional exclusionary doctrine '[t]he criminal is to go free because the constable has blundered.'" (citation omitted)). Nevertheless, a private citizen's right to be free from unreasonable searches and seizures is so jealously protected that society must at times bear the cost of excluding probative evidence in order to curb police misconduct. *See id*; *see also Nix v. Williams*, 467 U.S. 431, 442-43 (1984) ("The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic

9

and socially costly course is needed to deter police from violations of constitutional and statutory protections.").

Because the scope of the exclusionary rule hinges on its deterrent value, it makes sense that the rule does not apply where the government obtained the challenged evidence from a source *wholly* independent of any constitutional violation. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920). The independent source doctrine applies both to "evidence obtained for the first time during an independent lawful search" and to "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Murray*, 487 U.S. at 537-38. That is because "[w]hen the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Id.* at 537 (quoting *Nix*, 467 U.S. at 443).

In *Murray*, federal law enforcement agents began surveillance of the defendants after informants alleged that the defendants were distributing controlled substances. *Id.* at 535. The defendants were arrested after agents observed them driving a truck and a camper into a warehouse and turning the vehicles over to their coconspirators. *Id.* Both vehicles were later found to contain marijuana. *Id.* The agents then forced entry into the unoccupied warehouse and saw more marijuana in plain view. *Id.* The agents departed without removing the marijuana, kept the warehouse under surveillance, and did not reenter it until they had a search warrant. *Id.* In contrast to this case, when applying for the warrant, "the agents did not mention the prior entry, and did not rely on any observations made during

10

that entry." *Id.* at 535-36. With the warrant in hand, the agents returned to the warehouse and seized the marijuana and other evidence. *Id.* at 536.

In an opinion written by Justice Scalia, the Supreme Court held that, in determining the applicability of the independent source doctrine, "[t]he ultimate question … is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here." *Id.* at 542. The Court opined that "[t]his would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id.* (footnote omitted). These two conditions are sometimes referred to as a two-pronged test. The Court ordered a remand to the district court to conduct fact finding on the first prong and thereby determine whether agents "would have sought a warrant if they had not earlier entered the warehouse." *Id.* at 543. As to the second prong, the Court noted that the district court found that "the agents did not reveal their warrantless entry to the Magistrate, … and that they did not include in their application for a warrant any recitation of their observations in the warehouse[.]" *Id.* Thus, the Court made clear that the application of the independent source doctrine turns on historical facts showing whether a prior illegal search affected either law enforcement's decision to seek a warrant or the judicial officer's decision to issue it.

Likewise, in *Segura v. United States*, the Supreme Court concluded that a warrant that did not mention law enforcement's prior illegal entry or any observations made during that entry was an independent source for the challenged evidence. 468 U.S. at 815. During surveillance, law enforcement agents observed Segura and Colon deliver a "bulky

11

package" to two individuals in a restaurant parking lot. *Id.* at 799-800. The officers followed the two individuals to their apartment and found one in possession of cocaine. *Id.* The two individuals were arrested; one informed the agents that Segura and Colon were involved in the sale and distribution of controlled substances. *Id.* at 800. An Assistant U.S. Attorney advised the officers that a warrant for Segura's and Colon's apartment could not be obtained until the following day, and instructed the agents to secure the premises to prevent the destruction of evidence. *Id.* That evening, the officers illegally entered Segura's and Colon's apartment, where they observed drug paraphernalia in plain view. *Id.* at 800-01. The agents arrested Segura and Colon; two agents remained in the apartment until a search warrant was issued the next day. *Id.* at 801. Agents then executed the warrant, seizing, among other things, cocaine and records of narcotics transactions. *Id.* In applying the independent source doctrine to the warrant, the Court reasoned:

> None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry. No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant. It is therefore beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged…. The valid warrant search was a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the entry.

*Id.* at 814. Since *Segura* and *Murray* were decided, the United States Supreme Court has never applied the independent source doctrine to a warrant obtained through an application that included information derived from a prior illegal entry.

12

As the Majority explains, there is a split of authority regarding the applicability of the independent source doctrine when law enforcement officers have included tainted information in a search warrant application. Federal appellate courts have held that a tainted warrant can be a source wholly independent of constitutional violations, provided the warrant application contains probable cause apart from the tainted information. *See, e.g.*, *United States v. Jenkins*, 396 F.3d 751, 758 (6th Cir. 2005); *United States v. Restrepo*, 966 F.2d 964, 972 (5th Cir. 1992); *United States v. Swope*, 542 F.3d 609, 615 (8th Cir. 2008); *United States v. Walton*, 56 F.3d 551, 554 (4th Cir. 1995). This approach is equivalent to the test that the United States Supreme Court adopted in *Franks* to determine probable cause where an officer has knowingly or recklessly included false statements in a warrant application.

Some state appellate courts, however, have held that the prosecution must prove the second *Murray* prong with historical facts in the record, and that no warrant can be truly independent of Fourth Amendment violations if the warrant application contains information derived from the violation. *See Commonwealth v. Katona*, 240 A.3d 463, 481 (Pa. 2020); *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992); *State v. Lewis*, 809 P.2d 925, 930 (Alaska Ct. App. 1991); *State v. Wagoner*, 24 P.3d 306, 316 (N.M. Ct. App. 2001) (rule adopted under New Mexico's state constitution).

### III

### Discussion

In concluding that the independent source doctrine applies to the warrant in this case, the Majority charts an ill-advised course. The Majority adopts as part of Maryland's

independent source test the lower federal courts' excision approach to *Murray*'s second

prong. In doing so, the Majority incentivizes law enforcement officers to conduct illegal

confirmatory searches.[3] I would instead hold that, if any tainted information from an

unconstitutional warrantless search was provided to the issuing judge, the State must

establish on review that none of that information was relevant to the issuing judge's

probable cause determination. In other words, the State must show that none of the tainted

---

[3] The Majority assumes without deciding that the officers violated the Fourth Amendment by entering Mr. Founds's apartment without probable cause. I would hold that the State failed to establish that exigent circumstances justified the warrantless entry of Mr. Founds's apartment. Nowhere in the record is there any statement by officers that they entered the apartment to prevent the destruction of evidence. In the application for the search warrant, the affiant stated that the officers "placed [Mr.] Founds into investigative detention and investigators immediately conducted a protective sweep of the apartment to secure it in preparation for a search warrant." In his argument at the suppression hearing, the prosecutor stated that it was reasonable for the officers to enter the apartment without a warrant "to try to establish if they are at the right location and whether or not there's enough evidence for a crime" and because Mr. Founds told them that there was another person in the apartment. In other words, the prosecutor justified the search, in part, on the unconstitutional ground that it was appropriate to do a confirmatory search of the apartment prior to obtaining a warrant.

The state of the record may be attributable, in part, to the officers' description of the warrantless entry as a "protective sweep," which is a term of art. As discussed above, a protective sweep is defined in Fourth Amendment jurisprudence as "a quick and limited search of a [sic] premises, incident to an arrest and conducted to protect the safety of police officers or others." *Buie*, 320 Md. at 698. The word "protective" in that context refers to protection of the officers, not to protection of any evidence that may be present in the premises. Here, the officers did not arrest Mr. Founds. This suggests that the officers may have used the term "protective sweep" as shorthand for entering the premises to prevent destruction of evidence. However, given the lack of any reference by the officers to destruction of evidence, and in light of the prosecutor's statement that the officers entered the apartment, in part, "to try to establish if they are at the right location and whether or not there's enough evidence for a crime," I cannot conclude that the warrantless entry passed muster under the Fourth Amendment.

information increased the quantum of probable cause stated in the warrant application. Because the suppression court applied the wrong test, I would reverse the judgment of the Appellate Court and direct a remand to the suppression court to apply the correct one.

**A**

I agree with the Majority that, in *Murray*, the Supreme Court set forth a two-part test that the State must satisfy whenever it invokes the independent source exception to the exclusionary rule. I also agree with the Majority's understanding of *Murray*'s first prong. *See* Maj. Slip Op. at 30-31. The Majority is also correct that, as a matter of first impression in Maryland, we must decide whether the *Franks* methodology is a good fit for the second prong of the *Murray* test. The Majority decides that it is. I disagree.

1

The independent source doctrine applies to evidence *actually* obtained through an *independent* source. The focus on what *in fact* happened, rather than on what *would have happened*, distinguishes the independent source doctrine from the inevitable discovery doctrine. *Williams*, 372 Md. at 410. The Majority's approach more closely resembles the latter because it asks whether the challenged evidence would have been admissible if the illegal police misconduct had never occurred. Because different judges have different views on what constitutes probable cause, and it would be impossible to know which judge would have been asked to issue the warrant, an objective test that asks whether a reasonable judge would have found probable cause with the tainted information excised from the application is a more defensible approach when analyzing what reasonably would have happened if the misconduct had not occurred.

15

Here, however, the State relies solely on the independent source doctrine. Thus, the analysis begins with the fact that police misconduct *did* occur, and from there requires an analysis of historical facts to determine the role that the misconduct actually played in the subsequent discovery and seizure of the evidence. An analysis that asks what *would have* happened to determine what *actually* happened attempts to force a square peg into a round hole.

In *Murray* and *Segura*, the Court applied the independent source doctrine to the historical facts and circumstances reflected in the records of those cases; where the records were lacking, the Court remanded to the trial court for further findings of historical fact. The Court said nothing about conducting a *Franks*-style excision analysis. *Franks* was decided only six years before *Segura* and 10 years before *Murray*. Had the *Murray* Court intended that its second prong determine whether the tainted information was essential to the probable cause determination, it likely would have expressly referred to *Franks* or to excision in some manner. It did not do so.[4] As discussed in the next section, the Majority errs in relying on federal court decisions that have imported the *Franks* methodology into the independent source analysis.

---

[4] The Majority interprets *Murray*'s silence regarding excision differently, asserting that there was no reason for the *Murray* Court to comment on *Franks* or an excision analysis because the warrant at issue in *Murray* did not contain any tainted information. *See* Maj. Slip Op. at 34. To be sure, the *Murray* Court did not lay out a specific test for analysis of the second prong. However, as discussed below, a close reading of *Murray* reveals that the Court necessarily concluded that the excision approach is not appropriate under *Murray*'s second prong. Against that backdrop, the absence of any mention of *Franks* or excision in Justice Scalia's opinion supports my reading of *Murray*.

16

2

In adopting the *Franks* excision methodology for *Murray*'s second prong, the Majority largely relies on federal appellate decisions. *See* Maj. Slip Op. at 23-30, 32-34. Respectfully, I do not find those decisions to be well-reasoned. They are thin on analysis and, ultimately, unpersuasive. Before I get to those decisions, however, it is useful to discuss *Franks* itself.

a

As Mr. Founds argues:

[T]he *Franks* test is inapt here because in that context, the question is whether the Fourth Amendment (namely, the Warrant Clause) has been violated *at all* – not about how to apply the exclusionary rule once there is an admitted Fourth Amendment violation…. The independent source doctrine, by contrast, applies only where there has *already* been a Fourth Amendment violation – the only question is one of remedy. And that difference is significant because the primary purpose of the exclusionary rule is deterrence, … which is irrelevant when determining whether the Warrant Clause has been violated in the *Franks* context.

I agree with Mr. Founds.

The *Franks* Court held that to challenge the veracity of an affidavit supporting a warrant application in an evidentiary hearing, a criminal defendant must make a substantial preliminary showing that the affiant deliberately, or with reckless disregard, injected falsehood into the affidavit. 438 U.S. at 171. In addition to showing a preponderance of intentionality, a successful challenge requires that the falsehood be material to the issuance of the warrant. *Id.* at 171-72. Materiality in the *Franks* context is measured by excision: "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of

17

probable cause, no hearing is required." *Id.* Because a defendant must establish both mens rea and materiality to obtain relief under *Franks*, the failure to show either is fatal to the challenge. *Id.*; *see also id.* at 171 (explaining that application of the exclusionary rule in the *Franks* context is consistent with the Court's record in suppressing evidence "where a Fourth Amendment violation has been *substantial and deliberate*") (emphasis added).

The two prongs of the *Franks* rule work together to strike the right balance in determining whether evidence seized under an invalid warrant should be excluded: the materiality prong ensures that a Fourth Amendment violation – i.e., the issued warrant lacks probable cause – has indeed occurred, while the recklessness or deliberate falsehood prong ensures that suppression of evidence seized under the warrant occurs only where doing so meaningfully deters police misconduct. As applied to a deficient warrant, the ending point of the *Franks* materiality analysis – the determination that the "clean" information contained in a warrant affidavit is insufficient to support probable cause – coincides with the starting point of the independent source analysis: that a Fourth Amendment violation has indeed occurred. Notably, under *Franks*, the defendant bears the burden.

b

*Franks* concerns a different context than the one before this Court. For starters, the State, not the defense, bears the burden of proving both prongs of the *Murray* test. Yet the Majority imports *Franks*'s excision methodology for determining materiality into

18

*Murray*'s second prong, relying on federal appellate decisions. The Majority's analysis misses the mark.

*i.*

In applying *Franks* in the independent source context, federal appellate courts have reasoned that the excision method is necessary to prevent officers from being worse off than they would be had they not engaged in an unconstitutional search. *See, e.g.*, *Swope*, 542 F.3d at 615; *Jenkins*, 396 F.3d at 758; *United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir. 1992). That position rests on a flawed reading of *Nix v. Williams*. The "worse off" language in *Nix* (which the *Murray* Court quoted) explains the rationale for the inevitable discovery and independent source exceptions to the exclusionary rule. *See Nix*, 467 U.S. at 443.

The exclusionary rule deters Fourth Amendment violations by indeed placing the State in a worse position than it would have occupied had the violation not occurred. *See Davis*, 564 U.S. at 231-32 (characterizing the exclusionary rule as a "deterrent sanction"). The independent source doctrine is a limited exception to that rule. *See Murray*, 487 U.S. at 537. It recognizes that when the State establishes that the challenged evidence was obtained through a source wholly independent of the constitutional violation, suppressing that evidence no longer advances the exclusionary rule's deterrent purpose. *Id.* (citing *Nix*, 467 U.S. at 443). In that case, suppression exacts too high a price – by putting the State in a worse position than if the constitutional violation had never occurred – without the deterrent benefit of excluding the evidence. *Id.*

19

Contrary to the rationale of the federal appellate courts (and the Majority here), *Nix* affirms the high court's consistent teaching that suppression turns on deterrence. The *Nix* Court did not say that, in determining whether the challenged evidence should be excluded, courts strike the proper balance by placing law enforcement officers in the same position they would have been in but for the earlier constitutional violation. Instead, the Court explained that *if* the challenged evidence was obtained through a source wholly independent of an earlier constitutional violation, law enforcement would be placed in a worse position if courts nonetheless suppressed the evidence:

> When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Nix*, 467 U.S. at 443.

The "worse off" language, then, explains why the independent source exception to the exclusionary rule exists in the first place; it does not inform the method by which we determine, as a matter of historical fact, whether the evidence was obtained from a source wholly independent of the constitutional violation. The Majority's reliance on this phrase to determine the scope of the independent source exception, therefore, is misplaced. The federal appellate cases that the Majority cites suffer from the same flaw.

Setting aside the exclusionary rule's deterrence rationale, no one compels an officer to include tainted information in a warrant application. If the affiant in this case had not included Corporal Converse's observations during the illegal entry in the warrant application, this case would be materially indistinguishable from *Segura* and *Murray*. The issuing judge's decision-making process would not have been tainted. What distinguishes

20

this case from *Segura* and *Murray* is the affiant's decision to include tainted information in the warrant application.

*ii.*

In addition to misinterpreting the "worse off" language in *Nix* and *Murray*, the federal appellate cases fail to give effect to Justice Scalia's phrasing of *Murray*'s second prong, as well as his explanation of the purpose of that prong.

Under *Murray*'s second prong, the independent source doctrine does not apply "if information obtained during [a prior unlawful warrantless] entry was presented to the Magistrate *and affected his decision to issue the warrant*." *Murray*, 487 U.S. at 542 (emphasis added). In *United States v. Restrepo*, the Fifth Circuit explained that prior to *Murray*, the Fifth Circuit and other federal appellate courts, applying the logic of *Franks*'s rule concerning false statements in warrant affidavits, "had adopted variations on the rule that evidence obtained in an illegal search is first excised from the warrant affidavit, after which the expurgated version is evaluated for probable cause." 966 F.2d at 969. The *Restrepo* Court referred to the key phrase in *Murray* – "affected [the magistrate's] decision to issue the warrant" – as an "unfortunate sentence fragment[.]" *Id.* at 970. The Fifth Circuit opined that "[n]othing in *Murray* – other than perhaps [that] unfortunate sentence fragment … indicates that the Supreme Court intended to reject [the federal circuits'] prevailing *Franks*-inspired rules." *Id.* Rather, the court stated, the "affected" language "almost certainly was simply a paraphrase – albeit a confusing one when considered noncontextually – of the [redaction] approach long sanctioned in the circuits." *Id.*

21

The Fifth Circuit's characterization of the "affected" language is incorrect. It is not an "unfortunate sentence fragment." Rather, it is part of the Supreme Court's formulation of *Murray*'s second prong. Nor is there any reason – other than the federal appellate courts' apparent preference that their pre-*Murray* jurisprudence continue to rule the day – to interpret *Murray*'s "affected" language as a confusing "paraphrase" of those pre-*Murray* decisions. *Murray* did not cite any of those cases, let alone cite them with approval.

Implicit in *Restrepo*'s denigration of Justice Scalia's phrasing of the second prong is the recognition that the phrase "affected his decision to issue the warrant" is inconsistent with a *Franks*-style redaction analysis. That redaction analysis considers whether the tainted information in an affidavit was essential to the probable cause determination. The ordinary meaning of "affect" is not being "essential to." Rather, it is "to influence in some way." *Affect*, BLACK'S LAW DICTIONARY (12th ed. 2024).

It is not only Justice Scalia's phrasing of the second prong that is inconsistent with the federal appellate cases' interpretation of *Murray*. In rejecting Mr. Murray's argument that the independent source doctrine would undermine the deterrent rationale for the exclusionary rule, the *Murray* Court effectively rejected the application of the excision analysis previously used by federal appellate courts. Mr. Murray argued that, under the independent source doctrine, police would be "encourage[d]" to engage in "unlawful police searches." *Murray*, 487 U.S. at 539. He contended that

> law enforcement officers will routinely enter without a warrant to make sure that what they expect to be on the premises is in fact there. If it is not, they will have spared themselves the time and trouble of getting a warrant; if it is, they can get the warrant and use the evidence despite the unlawful entry.

22

*Id.* Justice Scalia dismissed that concern. He explained that if law enforcement officers engaged in such conduct, the government would have to do more than show a reviewing court that the untainted information would have established probable cause; it would have to convince a reviewing court that the tainted information had no effect on the issuing judge's decision:

> We see the incentives differently. An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, *since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it.*

*Id.* at 540 (emphasis added).

Justice Scalia thus made clear that including tainted information in an affidavit imposes a burden on the State beyond merely showing the reviewing court that probable cause could have been found based on the untainted information. That is, the State must establish that the tainted information did not actually affect either the officer's decision to seek the warrant or the magistrate's decision to issue it. *See id.* But under the *Franks*-type test adopted by the federal appellate courts, once a reviewing court concludes that probable cause could be found on the remaining, untainted information after excision, the inquiry ends, regardless of the tainted information's actual effect on the issuing judge. *Restrepo*, *Swope*, *Jenkins*, and the other cases cited by the Majority therefore relieve the State of the "much more onerous burden" that the *Murray* Court identified as the safeguard against the risk of undermining the deterrence function of the exclusionary rule.

23

The Majority asserts that I have taken Justice Scalia's reference to the "much more onerous burden" out of context. Maj. Slip Op. at 35. I disagree. Justice Scalia was responding to a criticism of the two-pronged inquiry articulated in his majority opinion: that it would incentivize unlawful confirmatory searches. *See Murray*, 487 U.S. at 539-40. He explained that, if an officer has sufficient probable cause, it would be "foolish" for the officer to conduct an illegal search and incur the "much more onerous burden" of proving that the tainted information did not affect both the decision to seek a warrant (the first prong) and the issuing judge's decision to issue the warrant (the second prong). *Id.* at 540. Although the Court did not take the additional step of fashioning a test for ascertaining whether tainted evidence affected the magistrate's decision to issue the warrant – because that issue was not presented on the facts – the Court made clear that whatever that test is, it needs to be "much more onerous" than simply establishing to a reviewing court that the untainted information alone would establish probable cause in the eyes of most judges. Otherwise, the Court's "much more onerous burden" language has no meaning.

As they must, the federal appellate decisions recognize that tainted information in a warrant application may well affect the issuing judge who reviews it; however, where the untainted information in the application establishes probable cause, those courts dismiss the effect of the tainted information as "minor." *See, e.g.*, *Swope*, 542 F.3d at 614 (reasoning that fruits of search conducted under a warrant should not be suppressed where "the magistrate was affected in some minor way by tainted information," as long as "the warrant would have been granted even without the tainted information"). The Majority cites this analysis favorably. Maj. Slip Op. at 24, 28, 29. However, the second *Murray*

prong does not excuse the use of tainted information so long as a reviewing court determines that its effect on the issuing judge was insubstantial or minor. Rather, *Murray* referred to tainted information having "affected" the decision to issue the warrant. Any effect on the decision to issue the warrant renders the independent source exception inapplicable.

*iii.*

Finally, after comparing the contexts at issue in *Franks* and *Murray*, the federal cases discern no material distinctions between the two that would justify different analyses. *See, e.g.*, *Jenkins*, 396 F.3d at 759 ("Since knowingly including a false statement in a warrant affidavit seems the functional equivalent of (if not an even more serious transgression than) including in the affidavit knowledge of facts illegally obtained, then it makes sense to deal with cases such as the present one in the same fashion" as *Franks*.) (citation modified). In this regard, the federal decisions fail to account for the deterrent purpose of the exclusionary rule. When an officer is shown to have deliberately included false information in a warrant affidavit, that finding – and the likely resulting professional consequences to the offending officer – will tend to deter other officers from engaging in similar misconduct even if the evidence is not excluded. In the independent source context, however, deterrence of the behavior we want to discourage – using the fruits of an unconstitutional warrantless search – is accomplished only through suppression of the evidence.

In sum, the Majority errs in relying on federal appellate decisions that do not persuasively explain why the *Franks* excision analysis is a good fit for *Murray*'s second

prong. This Court should not follow the federal appellate courts down a path that lessens the protections of the Fourth Amendment.

## B

The Majority's position creates affirmative incentives for law enforcement to engage in unreasonable searches and seizures. Suppose law enforcement officers believe – through investigation or informants – that they most likely have probable cause to secure a warrant to enter a home, and that belief is correct. Ordinarily, the officers would apply for a warrant based on facts supporting probable cause, a judge would issue the warrant, and the officers would enter the home based on the warrant. Not all such endeavors yield the seizure of evidence supporting the conviction of a crime, of course, because "[p]robable cause is much less than certainty" that the home indeed contains evidence of crime. *Murray*, 487 U.S. at 546-47 (Marshall, J., dissenting). If a warrant-authorized search bears no fruit, officers may have to repeat the process of collecting information supporting probable cause to search at another location, apply for and obtain another warrant, and execute the new warrant in the hope that this attempt yields a different result than the one before. The process is time-consuming and uncertain because the Fourth Amendment so demands.

The Majority's approach changes that calculus. Officers who believe they likely have probable cause to obtain a warrant may be tempted to enter a home without one, confirm that there is evidence of crime on the premises, apply for a warrant that includes their observations to ensure its issuance, and then return to the property and seize the evidence under the issued warrant. After today's decision, officers can be confident that

they will not be worse off and may very well be better off for having entered the home illegally. That is because if no incriminating evidence is found on the premises, the officers do not have to go to the trouble of obtaining a pointless search warrant.[5] But if the confirmatory search reveals items worth seizing, a reviewing court will excise the information obtained through the illegal search and uphold the warrant if the officer included enough untainted information to meet the probable cause standard. In the aftermath of the Majority's decision, officers will lack any incentive to apply for a warrant without first entering the premises illegally to confirm that the home is indeed worth searching.[6]

Whether such a confirmatory search proves fruitful for law enforcement, the people who reside in the premises suffer an unconstitutional search that courts are powerless to remedy or prevent. The Majority's approach, therefore, undermines the very purpose of the exclusionary rule.

## C

In my view, the second prong of the *Murray* test has two subparts. First, the State may attempt to show that no tainted information from a prior unlawful warrantless entry

---

[5] The Majority, as well as the federal cases upon which the Majority relies, do not consider this aspect of confirmatory searches in their discussions of incentives. *See* Maj. Slip Op. at 26, 35.

[6] Notably, at the suppression hearing in this case, the prosecutor told the court that one of the reasons the officers entered Mr. Founds's apartment to conduct a "protective sweep" was to confirm their suspicion that the apartment contained evidence of criminal activity.

was included in the warrant affidavit presented to the issuing judge. If the State makes that showing, the inquiry under the second prong ends, as it did in *Murray*.

Second, if tainted information was included in the warrant affidavit, the State must show that none of it was relevant to the determination of probable cause. Recall that, with respect to the decision to issue the warrant, the independent source doctrine does not apply "if information obtained during [a prior unlawful warrantless] entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray*, 487 U.S. at 542. Several state appellate courts have read this language to mean that, if officers include *any* tainted information learned as a result of the prior entry, the State cannot establish *Murray*'s second prong. *See, e.g.*, *Katona*, 240 A.3d at 481 (independent source doctrine inapplicable if "the magistrate was informed at all of the information") (quoting *Commonwealth v. Brundidge*, 620 A.2d 1115, 1119 (Pa. 1993)); *Clark*, 844 S.W.2d at 600 ("In order for the subsequent warrant and search to be found genuinely independent of the prior unconstitutional entry, the second *Murray* requirement mandates that information obtained during the illegal entry may not have been presented to the issuing Magistrate.").

I would not adopt a purely subjective test for *Murray*'s second prong, as those state appellate courts have done. In this regard, I agree with the Majority that the phrase "and affected [the Magistrate's] decision to issue the warrant" signals an additional inquiry beyond whether any tainted information was included in the warrant application. I also agree with the Majority that this language regarding the effect of the tainted information on the issuing judge implicates an objective inquiry. I doubt that the *Murray* Court envisioned the State calling issuing judges as witnesses at suppression hearings to testify

28

whether the tainted information in a warrant affidavit actually affected their decision to issue the warrant.

Where I part ways with the Majority is in determining the proper objective test for the second subpart of *Murray*'s second prong. As discussed above, Justice Scalia made clear in *Murray* that the inquiry is not whether the warrant affidavit, stripped of the tainted information, provides probable cause for the search warrant. That tells us only whether the warrant *could have* been issued without the tainted information, not whether it in fact affected the issuing judge's decision. The objective test that gives effect to the language of *Murray* and furthers the deterrent purpose of the exclusionary rule is this: the State must prove that none of the tainted information included in the warrant application was relevant to the probable cause determination. Put another way, the State must establish that a reasonable judicial officer would conclude that none of the tainted information increases the quantum of probable cause set forth in the warrant application. If the State makes that showing, it has ruled out the possibility that the tainted information affected the issuing judge's decision to issue the warrant. In most cases where officers have included tainted information in a warrant application, this will probably be a difficult burden for the State to meet, as well it should be. *See Murray*, 487 U.S. at 540 (undertaking an illegal confirmatory search results in the "much more onerous burden of convincing a trial court that no information gained from the illegal entry affected … the magistrate's decision to grant [the warrant]").[7]

---

[7] The Majority criticizes my proposed test for *Murray*'s second prong on the ground that it "is a per se rule that if any tainted information is included in an affidavit, the

29

**D**

Not only does the Majority's approach undermine the purpose of the exclusionary rule, but the Majority also effectively replaces the judicial officer who signs a search warrant as the neutral, detached Fourth Amendment gatekeeper, and hands that duty over to the suppression court and any appellate court that reviews the suppression ruling after excising the tainted material. Contrary to the Majority's contention, de novo review by the suppression court or an appellate court in that context does not replicate how the issuing judge would have weighed the untainted information in the warrant application if the affiant had not also included the tainted material.

The Majority reasons that de novo review is necessary because "where a warrant affidavit has been infected either by untruthful information or information obtained in violation of the Fourth Amendment, … there is no *legitimate finding* [by the issuing judge] to which a reviewing court can defer[.]" Maj. Slip Op. at 40. But that is the point: When information obtained in connection with an unconstitutional warrantless search is included

---

exclusionary rule applies, regardless of whether law enforcement was aware that the information was tainted or believed its search to be lawful and justified under the Fourth Amendment, and regardless of whether the non-tainted information established overwhelming probable cause." Maj. Slip Op. at 37. That criticism misses the mark for several reasons. First, as discussed, my test is not a per se rule. Second, an officer's subjective good faith is immaterial where the officer lacks an objectively reasonable basis upon which to conduct a warrantless search. *See United States v. Leon*, 468 U.S. 897, 919 n.20 (1984) (explaining that the good faith exception to the exclusionary rule turns on the objective reasonableness of an officer's conduct, not on the officer's subjective good faith). Third, it is not always the case that the untainted portion of a warrant affidavit establishes "overwhelming probable cause." Maj. Slip Op. at 37.

30

in the warrant application and the magistrate issues the warrant, the warrant is presumptively not independent of the constitutional violation.

An excision analysis does not cure the problem. That a suppression court or an appellate court might conclude that, had the tainted information not been included, the "clean" warrant would still have satisfied the probable cause standard, is immaterial. In the independent source context, it is not the function of the reviewing court to speculate about what did not actually happen.[8]

---

[8] The Majority disagrees with my view that excision shows only that the warrant *could* have issued on the untainted affidavit, not that it necessarily *would* have. *See* Maj. Slip Op. at 34 n.8. According to the Majority, "[i]f the untainted facts establish probable cause, the warrant would have issued – because that is what a probable cause showing requires of any neutral judge." *Id.* The Majority overlooks the reality that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause[.]" *Leon*, 468 U.S. at 914. That recognition underlies the Supreme Court's "strong preference for warrants" and its declaration that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *Id.* (internal quotation marks and citations omitted).

Especially with respect to an affidavit containing a marginal showing of probable cause, it is possible, if not likely, that two issuing judges – both "neutral and detached" – will reach different conclusions about whether the affidavit provides probable cause. Similarly, suppression courts and appellate courts occasionally disagree whether a warrant was supported by probable cause. *See, e.g.*, *State v. Faulkner*, 190 Md. App. 37, 60 (2010) (reversing the suppression court on the ground that "the issuing judge had a substantial basis for finding probable cause to search the Plainfield Apartment"); *State v. Coley*, 145 Md. App. 502, 532 (2002) (reversing order suppressing evidence; "[t]aken as a whole, this search warrant application does not reflect 'pure speculation.' Indeed, the affidavit provides a substantial basis for the issuing magistrate to believe that illegal narcotics activity was occurring in [the] residence."); *Connelly v. State*, 82 Md. App. 358, 362 (1990) ("Appellant argues that the police affidavit was not sufficiently specific to support a finding of probable cause. We agree."), *vacated on other grounds*, 322 Md. 719 (1991); *State v. Amerman*, 84 Md. App. 461, 496 (1990) ("[W]e hold that Judge Lerner had a substantial basis for issuing the warrant and that the reviewing judge, therefore, was legally wrong to have suppressed the evidence.").

Moreover, the Majority fails to account for the cognitive inequality between foresight and hindsight. *See, e.g.*, *Beck v. Ohio*, 379 U.S. 89, 96 (1964) ("An arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure on an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment."). Under the Majority's approach, a reviewing judge who knows that a home contains evidence of crime must ignore that knowledge and attempt to assign a probability that the home might contain evidence of crime. Even the most scrutinizing and conscientious judge might fall short of that task through no fault of their own, simply because the human brain is known to take certain cognitive shortcuts. *See* Baruch Fischhoff, *An Early History of Hindsight Research*, 25 SOC. COGNITION 10 (2007) (hindsight bias shown to occur in many areas such as history, medicine, finance, and the law). The unreasonable risks of hindsight bias in this context are most pronounced in marginal cases. Under the Majority's ruling, if an officer thinks it is a close call whether probable cause exists, the officer is further incentivized to conduct a confirmatory search without a valid warrant. If the officer finds evidence of crime on the premises, the officer may hope that hindsight bias affects a reviewing judge's assessment of the warrant after excising the information about the officer's observations during the illegal entry. In circumstances where a reviewing judge's unbiased discernment in detecting constitutional errors is most necessary, the Majority's holding sets that process up for failure.[9]

---

[9] The Majority dismisses my warning about hindsight bias, arguing in essence that one can never completely eliminate counterfactual analysis in our justice system. *See* Maj.

32

Unlike the Majority's excision test, the objective test I propose for *Murray*'s second prong would not permit suppression and appellate courts to supplant the issuing judge as the arbiter of probable cause. Under my test, suppression and appellate courts would not speculate about hypothetical scenarios not presented to the issuing judge. Rather, they would review the information actually presented to the issuing judge and determine whether the tainted portion was relevant to the probable cause determination. That inquiry is well suited to a reviewing court and does not increase the risk of hindsight bias distorting the process.[10]

## IV

## Conclusion

The Majority's holding renders the exclusionary rule a toothless tiger in the context of the independent source doctrine. Unlike that of the Majority, my rule would further the

---

Slip Op. at 41 n.13. Although it might be impossible to completely eliminate the use of a counterfactual analysis, that does not diminish the appeal of a standard that minimizes its use, which is what my proposed objective test does. The Majority's approach unnecessarily exacerbates a known risk at the expense of Fourth Amendment rights.

[10] The Majority points to *Klingenstein v. State*, 330 Md. 402 (1993), and *Holmes v. State*, 368 Md. 506 (2002), as examples where this Court used objective excision analyses with respect to tainted warrants, despite the risk of hindsight bias coming into play. *See* Maj. Slip Op. at 41-42 n.13. However, those cases, like *Franks*, are not applications of the independent source doctrine. In *Klingenstein*, this Court did not mention *Segura* or *Murray*, nor did the Court state that it was applying the independent source exception to the exclusionary rule. *See Klingenstein*, 330 Md. at 414-15. In *Holmes*, this Court likewise did not refer to the independent source exception, let alone cite *Segura* or *Murray*. Thus, in neither *Klingenstein* nor *Holmes* did this Court consider whether the tainted information in a warrant application "affected" the decision to issue the warrant under *Murray*'s second prong.

deterrent purpose of the exclusionary rule by discouraging officers from including unlawfully obtained information in warrant applications.

The circuit court erred in denying Mr. Founds's motion to suppress. I would direct a remand to the suppression court to apply the correct test under *Murray*. Accordingly, I respectfully dissent.

Justice Watts and Justice Gould have authorized me to state that they join this opinion.